Superior Garment Co., an Oregon Corporation v. Commissioner.
Superior Garment Co. v. Commissioner
Docket No. 3697-64.
United States Tax Court
T.C. Memo 1965-283; 1965 Tax Ct. Memo LEXIS 49; 24 T.C.M. (CCH) 1571; T.C.M. (RIA) 65283; October 26, 1965
Morris J. Galen, for the petitioner. Richard H. M. Hickok, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: Respondent, pursuant to a statutory notice of deficiency, determined the following deficiencies in petitioner's income tax for its fiscal years 1960 through 1962: Fiscal Year
Ended Nov. 30
Deficiency
1960
$25,563.16
1961
18,154.10
1962
32,012.08
The issues for decision are: (1) whether the stockholders of Dennis Uniform *50 Manufacturing Co. acquired all of petitioner's stock for the principal purpose of avoiding Federal income tax within the meaning of section 269, Internal Revenue Code of 1954, by securing the benefit of a net operating loss carryover; and (2) whether petitioner's liability for the payment of accrued interest on the promissory note to Thomas S. Harrison was contingent and was not properly accruable in the taxable years herein involved. Findings of Fact Some of the facts have been stipulated and as stipulated are incorporated herein by this reference. Petitioner, Superior Garment Co., is an Oregon corporation with its principal offices located in Portland, Oregon. Petitioner, an accrual basis taxpayer, filed its Federal corporate income tax returns for its fiscal years ended November 30, 1960, 1961, and 1962, with the district director of internal revenue, District of Oregon. At all times from or about December 1, 1952, through on or about December 31, 1959, Thomas S. Harrison, Jr. (hereinafter referred to as Harrison), and Margaret S. Harrison were the owners of all of petitioner's outstanding shares. At all times prior to December 31, 1959, petitioner *51 was actively and continuously engaged in business as a contracting manufacturer of clothing apparel for other companies and owned a fully-equipped manufacturing plant for such production. (In such a contracting business, the contractor supplies labor and the trim, i.e., thread, buttons, etc., and the customer furnishes material and patterns.) Petitioner enjoyed a good reputation in its field. During the years in issue, there were few facilities in Portland which manufactured garments on a contract basis for other firms. Petitioner was at all times on an approved list of garment subcontractors. On and prior to December 31, 1959, petitioner had in its employ a competent labor force which was qualified to produce the type, quality, and quantity of garments required by its customers. Such a labor force in the garment industry is difficult to assemble in Portland. Prior to 1958, its primary customer was J. C. Penney Co. In 1958 and 1959, its principal customers were White Stag and Jantzen, for whom it manufactured sports clothes, both of whom were located in Portland, Oregon. In 1958 and 1959, White Stag placed certain orders with petitioner. White Stag's primary purpose was to assure *52 the continuity of this facility for subcontract work because of the scarcity of such facilities in Portland. These orders were financed by moneys advanced by White Stag to petitioner. White Stag felt such advances were a necessary protection to enforce performance of its orders. White Stag continued to do business with petitioner after these orders were completed. Between December 1, 1952, and December 31, 1957, Harrison advanced to petitioner by way of loans $144,555.20, which sum was reflected on petitioner's books as a liability to Harrison on December 31, 1957. On or about January 1, 1958, petitioner transferred inventory to Harrison at a value of $39,868.85, which sum was reflected on petitioner's books as a debit to the liability owing Harrison. In March 1958, Harrison went to work for White Stag on a full-time basis as a sales manager. Subsequent to his employment by White Stag, Harrison attempted to dispose of petitioner because he was unable to devote the necessary time to its operation. Harrison believed that petitioner would be an attractive business opportunity to another operator in the garment industry and also that petitioner's net operating loss would be of value. *53 Dennis Uniform Manufacturing Co. (hereinafter referred to as Dennis Co.) is and was at all material times an Oregon corporation, located in Portland, Oregon. All of the outstanding shares of Dennis Co. were at all times involved herein owned as follows: Shares
Fred Buchwalter
2
Erna Shipley, John Shipley, and
Marianne Buchwalter, [1] trustees of
Trust A under the last will and tes-
tament of Julian J. Shipley
3,999
Erna Shipley, John Shipley, and
Marianne Buchwalter, trustees of
Trust B under the last will and tes-
tament of Julian J. Shipley
6,000
John Shipley (hereinafter referred to as Shipley) and Fred Buchwalter (hereinafter referred to as Buchwalter) were and are officers of Dennis Co. At all times involved herein, Dennis Co. was engaged in the manufacture of garments, principally uniforms and similar items. At all times involved herein, Dennis Co. maintained a sales force and an employees' pension plan and had substantial selling expenses. It had customers throughout the country. Among its customers were parochial schools to whom Dennis Co. granted substantial rebates on orders of *54 uniforms. In 1959, Dennis Co. did not have sufficient facilities to manufacture all of the garments which it sold to customers. Prior thereto, Dennis Co. would have garments manufactured for it by independent contractors on a contract basis. [1] However, the work performed for Dennis Co. by contract manufacturers was not satisfactory. Moreover, deliveries were inconsistent, and, with respect to its subcontractor in San Francisco, California, the subcontracting process was cumbersome. Shipley and Buchwalter were dissatisfied with this situation. During 1959 Shipley and Buchwalter were looking for additional business investments for Dennis Co. In connection therewith, Buchwalter informed Carvel Linden, an officer of the United States National Bank of Oregon, of their quest for additional business opportunities relating to the garment industry, preferably an equipped garment plant. On April 30, 1959, Linden and another officer of the United States National Bank of Oregon, one Thomas Prideaux, apprised Buchwalter of Harrison's desire to dispose of petitioner's stock. Buchwalter, being familiar with *55 petitioner's business, indicated to said bank officials that he and Shipley would be interested in acquiring petitioner. They explained such interest on the basis of insufficient facilities to handle Dennis Co.'s expanding trade and the difficulties involved with Dennis Co.'s present subcontractors. In May or early June 1959, Harrison met with Buchwalter and Shipley and furnished them with information concerning petitioner's business and customers. Harrison also agreed to furnish Buchwalter with a list of petitioner's assets. The parties did not discuss petitioner's financial condition or earnings and losses at that meeting. On June 4, 1959, Harrison supplied Buchwalter with a list of petitioner's assets and advised him that an operating loss carryover was available. At all times during the negotiations, Harrison neither offered nor would consider the sale of petitioner's assets alone. He had been convinced at an earlier date by his accountant that avoidance of extreme loss in disposing of petitioner could be achieved only by selling it as a going business. On June 5, 1959, Buchwalter requested the General Appraisal Company, located in Portland, to make an appraisal of petitioner's *56 assets for the purpose of purchase. The insurable value of the assets was determined to be $34,002 and their fair market value was determined to be $23,733.50. At a meeting with Harrison prior to July 23, 1959, Buchwalter questioned Harrison as to whether there was any assurance White Stag would continue to give petitioner business following the proposed acquisition. Shipley and Buchwalter contacted White Stag and Jantzen and determined that both firms would continue to do business with petitioner if petitioner's stock were sold to Dennis Co.'s stockholders. [2]
Buchwalter and Shipley were not interested in purchasing petitioner's stock unless they could also purchase the real property occupied by petitioner. They believed that ownership of the real property by the Shipley and Buchwalter interests was essential to assure continuity of petitioner's operations. Additionally, they were interested in the investment *57 value of said real property. Consequently, they would not consider the purchase of the stock without the realty. Petitioner's plant was and is located on land which, in 1959, was owned by Great Western Homes, Inc., an Oregon corporation unaffiliated with any of the parties involved herein. The land was leased by Great Western Homes, Inc., to West House, an Oregon corporation controlled by Harrison, for a term expiring on December 6, 1964, at a rental of $1,120 per month through December 6, 1960, and $1,220 per month thereafter until the expiration of said lease. Harrison had personally guaranteed performance by West House of all of the terms and conditions of said lease, including the payment of rent. A portion of the premises was subleased by West House to petitioner and a portion thereof was subleased by West House to Glenn Matteson Company, Inc., an Oregon corporation not affiliated with any of the parties to said transaction. Shipley and Buchwalter queried their accountant as to the tax effect of petitioner's operating loss. He advised them to purchase petitioner only if it were a good business venture which they could operate profitably and not to consider the loss. Buchwalter *58 and Shipley informed Harrison that they were interested only in petitioner as a going business and did not consider that petitioner's operating loss was an asset. Accordingly, they offered to pay no more than what they considered petitioner's value as a going business. In accordance with this policy, prior to July 21, 1959, Buchwalter offered Harrison $20,000 for petitioner's stock on the condition that an agreement for the purchase of the building was reached with Great Western Homes, Inc.
On or about July 21, 1959, Harrison rejected Buchwalter's offer and made a counterproposal offering the following terms: (1) Harrison was to assume all of petitioner's liabilities. (2) Harrison was to sell petitioner's capital stock to Dennis Co. at the appraised price of the machinery and equipment which, according to Harrison, was $28,000. (3) Harrison was to receive 50 percent of the tax benefits derived from petitioner's existing net loss carryovers. Buchwalter rejected said offer in a letter dated July 23, 1959. Unable to agree on a purchase price during mid-July 1959, the parties suspended negotiations. In September 1959, Harrison contacted Buchwalter and arranged for a meeting *59 to be held early in October 1959 in the office of Harrison's lawyer. At the aforesaid October meeting, the president of the firm which owned the real property upon which petitioner was located agreed with Buchwalter and Shipley to sell said property for $125,000, conditioned upon their purchase of petitioner's stock for $20,000. A deadlock developed between the parties concerning the price to be paid for petitioner's stock. Harrison then agreed to submit a new offer to Buchwalter and Shipley. The offer was to sell petitioner's stock for $20,000 and to convert to capital all of Harrison's advances to petitioner, except the sum of $20,000 which would be payable in accordance with a promissory note containing the following provisions: On or before January 31, 1964, a sum equal to 50 percent of the United States corporate income tax of Superior Garment Co. for the year ended November 30, 1960, computed without any allowance for net operating loss deduction, together with interest on said sum at the rate of 6 per cent per annum from January 31, 1961. A sum computed in the same manner as the sum of the initial installment was computed shall be determined for each year thereafter and *60 shall be paid by Superior Garment Co. on or before January 31 for each year after 1964, together with interest thereon at the rate of 6 per cent per annum from the 31st day of January immediately following the end of the fiscal year for which such computation was made until the full sum of $20,000.00 shall have been paid Provided, however, if Superior Garment Co.'s net operating loss deduction is disallowed in whole by a judicial determination from which no appeal can be taken, this promissory note shall be void; provided further, however, the liability of Superior Garment Co. hereunder shall in no event exceed 50 per cent of the United States corporate income tax saved by Superior Garment Co. as a result of said net operating loss deduction. * * * Harrison originated and made the proposal that the promissory note be conditional upon petitioner's retention and enjoyment of the net operating loss carryover. On October 13, 1959, Harrison entered into an agreement with Shipley and Marianne Buchwalter for the sale of all of petitioner's outstanding stock in accordance with the terms of Harrison's offer submitted during the aforesaid October meeting. The agreement between the parties *61 provided for the sale to close on November 30, 1959, and for Harrison to pay a substantial part of petitioner's liabilities prior to that date. Harrison failed to perform said agreement so as to enable the closing. On December 31, 1959, Harrison, Shipley, and Marianne Buchwalter executed an additional agreement, and an indemnity agreement providing for the sale of petitioner's stock to close on that date. In accordance with said agreement, Harrison converted to capital all advances and loans made to petitioner and remaining unpaid by December 31, 1959, except advances in the aggregate sum of $28,635.83. [3] Petitioner paid Harrison the sum of $8,635.83. No installments have become due from or have been paid by petitioner to Harrison on account of the obligation evidenced by said promisory note. The sale of petitioner's shares closed on December 31, 1959. The sale of the real property described above by Great Western Homes, Inc., to Shipley, Marianne Buchwalter, and Max Buchwalter (father of Fred Buchwalter) was *62 also closed on December 31, 1959. Petitioner's current net income or net loss for each of its fiscal years 1955 through 1962 was as follows: Fiscal Year
Ended
November 30
Amount
1955
($ 3,327.16)
1956
( 99,283.66)
1957
($70,348.26)
1958
( 50,946.34)
1959
( 2,494.17)
1960
59,736.84
1961
45,488.65
1962
70,510.65 Petitioner's net operating loss carryover to the year beginning December 1, 1959, was $226,399.59. Since December 31, 1959, petitioner has actively and continuously carried on business as a contract manufacturer for other companies. Petitioner also continued to conduct said business at the same location, with substantially the same employees, machinery, and equipment. Subsequent to December 31, 1959, and up to the time of trial herein, petitioner continued to do business with White Stag and Jantzen. Petitioner's sales for the years ended November 30, 1958, through November 30, 1962, were principally as follows: Year Ended
Nov. 30
White Stag
Jantzen
Dennis
Other
Total Sales
1958
$ 21,360.93
$66,289.65
$ 87,650.58
1959
100,315.24
$5,950.76
2,204.68
108,470.68
1960
74,361.12
4,861.70
$153,348.72
4,817.14
237,388.68
1961
41,409.99
5,771.90
173,276.93
10,156.08
230,614.90
1962
42,862.87
4,391.18
324,832.52
790.67
372,877.24
*63 In the first half of 1965, petitioner has done nearly $40,000 worth of business for White Stag. Petitioner used the same formula for pricing goods manufactured for Dennis Co. as it used for pricing goods manufactured for White Stag and Jantzen. This formula was, generally, cost, plus 20 percent of cost for overhead, and 100 percent of the sum of cost and overhead for profit. There were no improprieties in the intercompany dealings between Dennis Co. and petitioner. Petitioner accrued and deducted interest on its promissory note to Harrison in the amount of $1,664.99 at November 30, 1962, computed upon principal amounts as follows: On $11,916.53 from January 31, 1962; On $ 8,083.48 from January 31, 1962. The principal amount at each date is computed in accordance with said promissory note, which provides that each installment will be a sum equal to 50 percent of the United States corporate income tax of petitioner for each year, computed without any allowance for net operating loss deduction, until the full $20,000 shall have been paid. Petitioner accrued and deducted interest in the amount of $1,200 at November 30, 1963, computed upon $20,000 from December 1, 1962. The *64 interest rate as provided in the promissory note is 6 percent per annum. Petitioner has not paid any of the interest so accrued and deducted. Petitioner claimed as deductions in its Federal corporate income tax returns for its fiscal years ended November 30, 1960, 1961, and 1962, net operating losses in the amounts of $59,736.84, $45,488.65, and $70,510.65. Respondent disallowed the foregoing deductions in their entirety on the grounds that petitioner failed to establish that said deductions are allowable under the provisions of the Internal Revenue Code of 1954. Petitioner also claimed as a deduction in its Federal corporate income tax return for its fiscal year ended November 30, 1962, an accrued interest expense on its promissory note to Harrison. Respondent disallowed said deduction on the grounds that petitioner failed to establish a bona fide obligation to pay same or that the instrument upon which it was based contained an unconditional promise to pay a sum certain in money. Ultimate Finding of Fact. The principal purpose for which the acquisition of petitioner's stock was made was not the evasion or avoidance of Federal income tax. Opinion The first *65 issue for decision is whether, under section 269(a) of the Internal Revenue Code of 1954, tax avoidance or evasion was the "principal purpose" for the acquisition by Shipley and Marianne Buchwalter of petitioner's stock. This is a factual question. Frank Spingolo Warehouse Co., 37 T.C. 1 (1961). Section 269 is applicable to an acquisition only if tax avoidance is the principal purpose of such acquisition. This Court has stated in Commodores Point Terminal Corporation, 11 T.C. 411, 418 (1948): a tax avoidance purpose incidental to such a transaction does not necessarily bring it within the condemnation of section [269]. The tax avoidance purpose must exceed in importance any other purpose to constitute the "principal purpose." * * * A careful scrutiny of the record in the instant case discloses that the "principal purpose" of Marianne Buchwalter and Shipley in purchasing petitioner's stock clearly was not the evasion or avoidance of Federal income tax. Instead, the record affirmatively *66 establishes that the principal purposes for which Marianne Buchwalter and Shipley acquired petitioner's stock were as follows: (1) Petitioner operated a going business as a contract garment manufacturer at all times prior to the sale in issue and had a good reputation in the industry, adequate plant and facilities, good customers, and a competent labor force; (2) Dennis Co., which was wholly owned by Shipley and Buchwalter interests, had a need for a reliable contract manufacturer of garments in the Portland area; and (3) the Shipley and Buchwalter interests were desirous at the time involved herein of acquiring additional business investments in the garment industry as well as acquiring an investment in real property; the acquisition of petitioner afforded them an opportunity to do both at the same time. [4]
Respondent errs in his contention that petitioner was an "insolvent, defunct taxloss corporation." The evidence in the record before us uncategorically demonstrates that petitioner was at all times *67 a viable entity actively engaged in the manufacture by subcontract of garments. During 1958 and 1959, petitioner manufactured a sizeable volume of garments for White Stag, Jantzen, and other customers. Its sales for the years ended November 30, 1958, and November 30, 1959, were $87,650.58 and $108,470.68, respectively. Immediately prior to December 31, 1959 (and thereafter), petitioner employed a labor force which on December 31, 1959, numbered 38 persons. After December 31, 1959, petitioner continued to conduct its business activities at the same location as prior to such time. During petitioner's last fiscal year under Harrison's management (1959), it actually earned an operating profit before depreciation of $3,000.67. Respondent proposes that the alleged proscribed purpose motivating the purchasers' acquisition of petitioner's stock can be ascertained through what he ascribes to be a "funneling" of income from Dennis Co. to petitioner in order to avail of petitioner's net operating losses. Respondent submits a schedule (1) comparing petitioner's sales and profits in 1960, 1961, and 1962 with those of Dennis Co. and (2) showing that Dennis Co. had a substantially lower profit *68 margin than petitioner. However, we believe that respondent's comparison of petitioner's sales and profits with those of Dennis Co. is misleading. The companies were not in the same business, and their operations were not comparable. Dennis Co. had substantial selling expenses, maintained a sales organization, sold to many customers throughout the country, maintained an employees' pension plan, granted substantial rebates to parochial schools, and had other expenses not common to petitioner's operations. Petitioner, on the other hand, had only three principal customers, all located in Portland, and had no selling expenses. Moreover, respondent's schedule lacks any probative value in the absence of any evidence showing Dennis Co.'s profit margins prior to the date of the acquisition in issue. Respondent also avers that the alleged "funneling" (evidencing the interdicted purpose) also manifested itself in the formula determining the price Dennis Co. paid petitioner for subcontracting work. However, the record establishes that the very same formula was used by petitioner to determine the price paid petitioner by White Stag for subcontracting work of essentially the same nature. Furthermore, *69 there is no indication of any improper intercompany practices. We also note that the desire to make petitioner a profitable enterprise, in the absence of any improprieties, is a traditional business goal and in no way supports an inference that the acquisition of petitioner's stock was for tax avoidance purposes. Respondent's claim that, in substance, Shipley and Marianne Buchwalter actually acquired petitioner's assets is not supported by the facts before us. The record discloses that Harrison would not have considered a sale of anything but petitioner's stock. Similarly, Shipley and Buchwalter were interested in acquiring a going business. They believed that a contract manufacturing unit could be profitably operated in Portland. Prior to the acquisition, petitioner had good customers, pending orders to fill, and commitments to meet. A purchase of assets alone would not necessarily have resulted in acquisition of such business. Additionally, petitioner, unlike Dennis Co., was on an approved list of subcontractors. The fact that Shipley and Buchwalter conditioned purchase of Superior Garment Co. stock upon acquisition by Shipley and Buchwalter interests of the realty upon which *70 petitioner was situated substantiates the primacy of their nontax avoidance motives in purchasing said stock. If their principal purpose in the venture was to acquire the loss, the empasis in the negotiations would have been on acquisition of the stock alone. Petitioner and respondent each muster an equally impressive volley of cases alleged to support their respective positions. However, inasmuch as the present inquiry is essentially factual, we see no need to discuss the cases cited by either party except to state that they are distinguishable on their facts, and, therefore, none are controlling herein. Section 269(c) provides if the consideration paid by the acquirer for the stock of the corporation is substantially disproportionate to the aggregate of the adjusted basis of the property of the corporation and the tax benefits obtained, such fact shall be prima facie evidence of the principal purpose of tax avoidance. Respondent argues that the consideration paid for control of petitioner was "substantially disproportionate" to petitioner's property and to the tax benefits acquired. However, *71 we see no need to comment on the merit of respondent's argument regarding section 269(c). Section 269(c) does not have the weight of a conclusive presumption (see Baton Rouge Supply Co., 36 T.C. 1 (1961). In the light of our finding of fact that the principal purpose of the acquisition was not tax avoidance, said presumption is rebutted. Accordingly, we hold for petitioner on this issue. The other issue for decision is whether petitioner's liability for the payment of accrued interest on the promissory note to Harrison was contingent and not properly accruable in the taxable years herein involved. Petitioner, an accrual basis taxpayer, accrued and deducted interest on its promissory note to Harrison in the amount of $1,664.99 on November 30, 1962, and $1,200 on November 30, 1963. As of the date of trial herein, petitioner has not made any payments on either the promissory note or the interest so accrued. The interest accured and deducted by petitioner was based upon the promissory note issued to Harrison on the sale of petitioner's stock to Shipley and Marianne Buchwalter. Said note contained the following language: Provided, however, if Superior Garment Co.'s *72 net operating loss deduction is disallowed in whole by a judicial determination from which no appeal can be taken, this promissory note shall be void * * *. The relevant prerequisites of an accruable liability are: (1) the liability must be binding and enforceable, (2) the liability must not be contingent upon the happening of a future contingent event, and (3) there must be a reasonable belief on the part of the debtor that the liability will be paid in due course. United Control Corporation, 38 T.C. 957 (1962). The interest which the petitioner accrued and deducted did not represent an enforceable obligation of the petitioner at the time of the accrual. The amount of the liability at the time of the accrual was not certain since the obligation of petitioner to pay Harrison $20,000 or any other sum, plus interest thereon, was by the terms of the promissory note, contingent upon a judicial determination that petitioner's net operating loss carryovers are allowable. Thus, we hold that petitioner's liability for the payment of accrued interest on the promissory note to Harrison *73 was contingent and was, therefore, not properly accruable during the taxable years in issue. Therefore, we hold for respondent on this issue. Decision will be entered under Rule 50. Footnotes
1. Marianne Buchwalter is the wife of Fred Buchwalter.↩
1. Dennis Co. was not engaged as a contract manufacturer for other companies.↩
2. At that time, an agreement between petitioner and White Stag as of December 30, 1958, was extant covering a $24,000 order placed by White Stag with petitioner. Said agreement did not impose any obligation upon White Stag to make any additional purchases from petitioner.↩
3. The sum of $20,000 was represented by petitioner's promissory note to Harrison and $8,635.83 was owed by petitioner to Harrison as a current account payable.↩
4. The acquisition of petitioner's stock by Marianne Buchwalter and Shipley was contingent upon purchase of the real property involved herein by Shipley and Buchwalter interests.↩