In the Matter of **FEDERATED DEPART-MENT STORES, INC. and Allied Stores Corporation, et al., Debtors.**

**Bankruptcy No. 1–90–00130.**

United States Bankruptcy Court,
S.D. Ohio, W.D.

Jan. 8, 1992.

parties and courts dealing with the aftermath of the 1980's takeover frenzy will soon have guid-      ance in this area.

David G. Heiman, Jones, Day Reavis & Pogue, Carl M. Jenks, Leslie A. Dent, Richard A. Chesley, Cleveland, Ohio, for petitioner.

D. Patrick Mullarkey, Tax Div., Dept. of Justice, Gerald C. Miller, Henry J. Riordan, W. Stephen Muldrow, Karen A. Smith, Washington, D.C., for respondent.

## FINDINGS OF FACT, OPINION AND CONCLUSIONS OF LAW RE: DEBTORS' OBJECTION TO CLAIM OF INTERNAL REVENUE SERVICE. (Re: TWIN FAIR)

J. VINCENT AUG, Jr., Bankruptcy Judge.

This action arises from the acquisition by Federated Department Stores, Inc. ("Federated") of the stock of Twin Fair Distributors Corporation ("TFDC") in May, 1982. Following this stock purchase, all seven of the TFDC stores acquired by Federated were converted into Gold Circle stores.

TFDC continued to operate as a separate subsidiary of Federated for three years following the stock purchase. In April, 1985, Federated liquidated and dissolved TFDC. In so doing, it acquired all of TFDC's assets and liabilities, including certain net operating losses ("NOLs") of TFDC. The former TFDC stores continued to operate as part of Federated's Gold Circle division until 1988 when Federated sold all of its Gold Circle stores. It is the use of the TFDC NOLs by Federated following the TFDC liquidation which is the subject of this dispute.

In its 1986 tax return, Federated deducted the NOLs that it had acquired from TFDC. The Internal Revenue Service of the United States ("IRS") disallowed Federated's use of these tax attributes and has filed proofs of claim against the Debtors which are based in large part on that decision.

This matter was tried on September 19 and 20, 1991. On the basis of all the evidence presented, the arguments and the briefs of counsel, including post-trial submissions, the Court makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

*Background of Gold Circle and Twin Fair*

1. In the early 1970's, Federated formed the Gold Circle Division ("Gold Circle"), which was to be Federated's entry into the rapidly expanding mass merchandising business. At that time, the mass merchandising business included stores offering moderately priced lines of hard and soft goods with a high degree of customer self-service. By operating in this manner, mass merchandising stores offer merchandise at reduced prices.

The real estate, merchandising and operations decisions of Gold Circle were directed toward customers 20 to 40 years of age with household incomes of $15,000 to $30,000. Gold Circle aimed to compete with hard goods specialists while also competing with major fashion chains. All Gold Circle stores were operated in the same manner with essentially the same merchandise.

2. Gold Circle was operated as one of Federated's retailing divisions. A division operates separately from Federated, but is not a separate subsidiary or taxable entity. As was the practice with all Federated divisions, Gold Circle was led by a two-person management team consisting of a chief executive officer and a president. One of these individuals would concentrate on the merchandising aspect of the division while the other would focus on the division's operations. During late 1981 and early 1982, Norman Matthews was the Chief Executive Officer of the gold Circle Division with James Guinan serving as the President.

3. As of June 1981, Gold Circle operated 41 stores in the Midwest and Northeast in a geographical area bounded by Rochester, New York, Pittsburgh, Pennsylvania, and Lexington, Kentucky. Gold Circle had a heavy concentration of stores in Ohio. In early 1981, Gold Circle had closed six stores in California because of losses and had acquired and renovated several former Clarkins stores in the Akron, Ohio area.

4. In 1981, despite overall market growth, Gold Circle continued to have a significant gap in its operating territory, particularly in the Northeast. Therefore, in a Long Range Plan (1981–1986) issued on July 8, 1981, Gold Circle established plans to expand in this market. At that time, Gold Circle did not have any stores in Buffalo, New York.

5. The Gold Circle Plan identified six principal criteria for determining whether the Division would expand into a new market: (1) location in the Northeast quadrant of the United States, exclusive of New England and New York City; (2) markets with projected population growth from 1980 to 1990 or with combined population, demographics, and competitive factors which would produce a satisfactory return on investment; (3) emphasis on markets where upscale mass merchandisers were not presently in place or where mass merchandiser square footage per capita was low; (4) capability of identifying and con-

trolling a sufficient number of store sites in a new market so that expenses necessary in the market would satisfy return on investment and discounted cash flow requirements; (5) a 21% incremental return on investment in the fifth full year of operation; and (6) a 15% discounted cash flow return in the first five years.

Buffalo, New York was determined to be a ideal location for Gold Circle under the criteria of the Long Range Plan.

6. Because of high construction costs, the Gold Circle Plan set forth analyses that the acquisition of an established business generally would allow expansion into a new location or market at approximately one half the investment required for a new store.

7. Twin Fair Distributors Corporation was one of the two principal subsidiaries of Twin Fair, Inc. ("Twin Fair"), which was a publicly traded corporation. Twin Fair Distributors Corporation—like Gold Circle— was a discount retailer which offered its customers a broad range of national brand name merchandise at promotional prices. In 1980, after 18 consecutive profitable years, TFDC was the leading discount retailer in the Western New York market, holding nearly a 50% market share. The April, 1980 issue of *Merchandising* magazine indicated that TFDC compared favorably to K–Mart, its primary competitor in the Buffalo market. All of the TFDC stores were within a 40–mile radius of Buffalo where TFDC maintained a high visibility by publishing a newspaper supplement twice a week.

8. In 1980, TFDC began to experience a financial downturn, which was attributable to double-digit inflation, record interest rates which approached 21% and increases in the minimum wage. The combination of these factors resulted in an increasing erosion of TFDC's profit margins. In an effort to reduce its increasing bank debt, TFDC sold its Ohio retailing stores to Meijer, Inc. during the second quarter of 1981.

9. Following the sale of its Ohio stores, TFDC continued to operate its Western New York stores. TFDC was continuing to purchase inventory for the stores and to advertise in the western New York media. TFDC spent nearly $2.9 million in advertising during the first nine months of 1981.

10. In September, 1981 Twin Fair decided to sell the remaining operations of TFDC. At that time, TFDC still had a strong franchise, the goodwill of loyal customers and some of the best store locations in Western New York.

11. Between 1980 and 1982, TFDC generated certain net operating losses. Twin Fair's tax return for the year ending December 31, 1981, showed NOLs of $18.9 million, the majority of which were attributable to TFDC. In 1982, TFDC incurred an additional $10 million in NOLs. On its tax return dated August 4, 1982, which was attached to the Twin Fair consolidated tax return for the year ending December 31, 1982, TFDC had NOLs of $25,755,657. In addition, TFDC had an investment tax credit carry forward of $934,061. These figures fairly and accurately reflected the NOLs that had been generated by TFDC during the previous years. These NOLs and credits remained on the books of TFDC when it was purchased by Federated.

*Federated's Acquisition of TFDC*

12. In mid–1981, Twin Fair retained the White Weld Capital Markets Group of Merrill, Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") to sell TFDC. Merrill Lynch had previously assisted Twin fair in the sale of TFDC's Ohio operations.

In late 1981, Federated, along with a variety of other retailers, received an unsolicited inquiry from the White Weld Capital Markets Group concerning the possible acquisition of TFDC. As the exclusive representative of Twin Fair in the sale of TFDC, Merrill Lynch prepared a briefing memorandum, which favorably described TFDC's current business and portrayed TFDC as an excellent acquisition for an existing retailer such as Federated.

Merrill Lynch acknowledged that TFDC had suffered some economic setbacks in 1980, but projected that TFDC could be made profitable through the significant overhead savings that could be achieved if TFDC was integrated with an existing re-

tail mass merchandise organization. Merrill Lynch further emphasized TFDC's favorable position in the Buffalo market, its cost effective advertising campaign and the fact that TFDC owned its own real estate.

13. After receiving the Merrill Lynch memorandum, Gold Circle began its investigation of the TFDC opportunity. First, the Chairman and President of Gold Circle visited the Buffalo locations and made preliminary assessments of the TFDC stores. Gold Circle's Chairman concluded that the TFDC acquisition fit squarely within Gold Circle's expansion program because TFDC was: (1) in the appropriate geographical region—between Rochester and Cleveland; (2) in a relatively low competitive market; and (3) a broadly based mass merchandiser. Gold Circle's President concluded that Buffalo was a natural "fill in" because Gold Circle already operated stores in nearby Rochester. Based upon the potential viability of the transaction, the TFDC stores were analyzed by a variety of Federated and Gold Circle departments, including Area Research, Construction, Interior Design, MIS, Legal and Finance.

14. The research produced by Federated's analysis and the recommendations to corporate officers to structure the acquisition as to acquire only the most profitable locations is persuasive evidence that the principal purpose for Federated's acquisition of the TFDC stores was to fulfill Gold Circle's business goal of expanding its operations into attractive new markets in the Northeast. The acquisition also offered Gold Circle the opportunity to acquire established store locations in the Buffalo market. Furthermore, the low mass merchandise density and minimum competition in Buffalo was similar to the Rochester market, where Gold Circle had operated successfully. Thus, the opportunity to acquire the TFDC stores satisfied all the criteria of the Gold Circle Plan for 1981–1986.

15. Based upon the analyses, the management of Gold Circle and Federated began negotiations for the TFDC acquisition in the fall of 1981. From the outset, Federated and Gold Circle expressed a desire to purchase only the assets of TFDC. Prior to this time, it had not been the practice of either Federated or Gold Circle to acquire the stock of a company. Twin Fair, however, was not willing to sell only assets because of its desire to divest TFDC in its entirety.

16. Another topic that emerged during the negotiations was the number of TFDC stores that Federated would acquire. Because some of the 15 available stores were not demographically acceptable, the negotiations focused on the better located stores. In the end, Federated acquired the seven TFDC stores which had been, and were projected to be, the most profitable.

17. In January, 1982, the subject of TFDC's net operating losses first came up during the negotiations. The NOLs were an important aspect of the transaction for Twin Fair because they were a vehicle for the company to obtain value. The NOLs were never the principal, or even a significant subject of negotiations for Federated or Gold Circle. With respect to Federated, while the NOLs were certainly considered as part of the analysis of the acquisition, the deal was structured so that Federated would receive no economic benefit if the NOLs were realized. For these reasons, the NOLs did not weigh heavily in the decision of Federated's Board of Directors to approve the acquisition of TFDC. In fact, because of their complexity, the NOLs were viewed by the some Federated officials as a detriment to the TFDC acquisition.

18. The NOLs were discussed by members of the Federated negotiating team, as well as examined internally at Federated. There were several reasons for this. First, Federated had never been involved in a transaction where net operating losses were at issue. Second, because Federated was constantly under audit by the IRS, Federated's tax department wanted to insure that the NOLs would pass scrutiny by the IRS. Third, because Federated bore all of the risk relating to the NOLs—with Twin Fair receiving all of the economic benefits of the losses upon their realization by Federated—Federated had substantial

incentive to insure that its risk was minimized. In addition, evidence was presented that Federated's tax department thoroughly analyzed the deductibility of the NOLs. While some members of Federated's tax department did have some reservations about the NOLs, Federated's outside counsel, as well as Price Waterhouse, Twin Fair's accountants, expressed complete confidence regarding the NOLs. In fact, Twin Fair believed that Federated's reservations about including the NOLs in the transaction were merely a negotiating ploy.

19. In March, 1982, a Capital Expenditure Request ("CER") was submitted for the TFDC acquisition. The CER was a standardized form that was used for all capital expenditures in excess of $1 million. The CER for the TFDC acquisition projected capital expenditures of nearly $7.5 million with total expenditures in excess of $15 million. The CER was submitted to Federated's corporate offices and, because of its amount, was to be submitted to the Board of Directors for approval. It was approved in a slightly revised form by the Board of Directors.

20. In completing the CER, Gold Circle prepared an analysis of the return on investment for the TFDC stores. The analysis indicated a return on investment of 46.1%, which was far higher than the Gold Circle standard of 21% for a new store investment. Gold Circle also analyzed the discounted cash flow return for the TFDC acquisition. This analysis indicated a return of 25.5%, which was also higher than Gold Circle's benchmark of 15%. Gold Circle performed the same analysis assuming that the benefit of the NOLs was not realized, and the impact on the discounted cash flow as a negligible .5%. Thus, based upon these calculations, the NOLs were not important to the ultimate analysis of whether the acquisition of TFDC would be profitable.

*Details of the Deal*

21. On May 5, 1982, Federated and Twin Fair entered into an Agreement for the Purchase and Sale of TFDC. Under this Agreement, Federated acquired the stock of TFDC in exchange for $550,000.00 in cash, a non-interest bearing promissory note with a principal amount of $8.1 million due on August 3, 1988, a non-interest bearing contingent note with a principal amount of $5.4 million, a $2 million loan to Twin Fair bearing interest at a 12% annual rate to be repaid in 36 monthly installments commencing July 1, 1984, and a $500,000 loan to Twin Fair bearing interest at a 12% annual rate to be repaid on February 3, 1983.

22. The $5.4 million promissory note was contingent on two factors. First, the note was to become null and void if TFDC elected not to renew the seven store leases with Twin Fair in 1988. Second, the note provided that $3.5 million of the principal amount would be payable "at a rate of one dollar ($1.00) for every two dollars ($2.00) of Twin Fair NOL carryover realized in excess of Twenty Million Dollars ($20,000,-000.00)".

23. In addition, Federated entered into a five-year lease with Twin Fair for each of the seven TFDC store locations. The leases provided for a minimum annual payment of $1.54 million to Twin Fair. The leases also contained four five-year options to renew, which, if exercised, would extend the leases through 2008. Under the terms of the leases, the rental amounts would increase to $2.77 million per year in 2008. Federated exercised the initial options to renew the seven leases in 1988.

24. In addition to the rental terms, the leases provided additional benefits to Twin Fair. First, the leases stated that Federated would be responsible for maintaining and repairing the buildings, all mechanical facilities, and the adjacent property, including the parking lots. The leases also had an override provision pursuant to which Twin Fair would be paid a bonus if TFDC's sales exceeded their projected amounts. During the first year of operation, the Buffalo stores had revenues in excess of these projections, and an override commission of approximately $65,000 was paid to Twin Fair. The leases also increased the value of Twin Fair's real estate by enabling Twin Fair to quickly lease the property adjoining the Gold Circle stores and by enhancing

Twin Fair's ability to eventually sell the property and acquire much-needed equity.

25. When Federated acquired the stock of TFDC, it obtained all of the assets as well as all of the liabilities of TFDC. In addition, Federated acquired the goodwill of TFDC, which it valued in excess of $4 million. Federated also received the surplus from TFDC's pension plan, which was terminated on the date of closing.

26. Although the transaction was originally to be closed on June 1, 1982, the resolution of discrepancies in TFDC's accounting records and problems with TFDC's banks delayed the actual closing until August 3, 1982.

27. During this delay, TFDC's financial situation deteriorated. TFDC closed the Buffalo stores that Federated had elected not to lease and consolidated the inventory in the stores that remained open. At no time, however, did TFDC realistically consider protection under the bankruptcy laws because it was believed that Twin Fair would realize far greater value for TFDC through private sale than through bankruptcy proceedings.

28. TFDC continued to operate the seven TFDC stores to be leased by Federated through the actual closing date of the sale.

*Events Following Acquisition*

29. After the August closing, Federated began to renovate and remodel the TFDC stores into the Gold Circle prototype. Because Gold Circle was not involved in the grocery business, it decided not to re-open the TFDC grocery departments which had been closed in early 1982. From a marketing standpoint, it was imperative that the stores be renovated and re-opened under the Gold Circle name before Thanksgiving, 1982, to take advantage of the lucrative Christmas shopping season. During the initial period of renovation, all seven of the Buffalo TFDC stores remained open under the Twin Fair name in order to continue selling the TFDC inventory and to maintain Twin Fair's presence in the Buffalo market. Because of reductions in inventory, by late October, 1982, only three of the Buffalo stores remained open.

30. As had been planned before acquisition, Gold Circle budgeted and spent approximately $1 million per store to renovate the seven Buffalo locations. In addition, Gold Circle had budgeted $250,000 per store for pre-opening expenses, which included the hiring of 1800 employees. Approximately 50% of the new work force, including management, consisted of former TFDC employees.

31. An extensive advertising campaign was also undertaken to create an awareness of Gold Circle in Buffalo. These efforts included appearances by executives on local television shows and participation in community events. A massive billboard campaign was also begun, using 20 billboards strategically placed throughout Buffalo. Next, a heavy radio and television advertising campaign was launched. Finally, a "countdown" advertising program was used in the Buffalo newspapers, leading to a grand opening circular that appeared on the day of the re-openings.

32. The renovations of the seven Buffalo stores were completed on schedule, and the re-opening of the stores was held on November 18, 1982. Gold Circle management had directed that the Buffalo re-opening be the largest in the Division's history, and by all accounts the re-opening was extremely successful, with sales volumes of $1.5 million.

33. For a period after the re-opening of the Buffalo stores they proved to have the best sales performance within the Gold Circle Division. Over the life of these Buffalo stores, however, sales performance fell to slightly below the Gold Circle average. Several factors resulted in a decrease in sales at the Buffalo stores, including a series of extremely bad winters, a downturn in the Buffalo economy and a change in exchange rates which reduced the flow of Canadian customers. Despite these problems, the Buffalo stores consistently averaged sales in excess of $10 million per year. Several other factors, however, reduced the profitability of the Buffalo stores, including a larger than average payroll and a rapid internal rate of deprecia-

tion which served to artificially depress the profits.

*Post–Acquisition Facts Regarding TFDC*

34. Following the acquisition, Federated continued to operate TFDC as a separate corporate entity. Because of this, separate books and records were maintained by TFDC.

35. TFDC was treated as a separate entity on Federated's consolidated balance sheet. According to Gold Circle's President, TFDC was maintained as a separate corporate entity because of the terms and nature of the transaction, as well as the rapid depreciation that was set exclusively for TFDC. Because TFDC was a separate corporation, it was anticipated that the NOLs obtained in the acquisition would be used to offset the income of TFDC, not that of Federated.

36. Following Federated's acquisition of TFDC, Gold Circle and TFDC executed a management agreement under which Gold Circle agreed to operate the seven TFDC stores. This agreement insured that the Buffalo stores would be operated in a manner similar to other Gold Circle stores. The agreement provided that Gold Circle would perform the following activities on behalf of TFDC: (a) order all merchandise for the TFDC stores and charge TFDC for these purchases; (b) order all non-merchandise goods for the TFDC stores and charge TFDC for these purchases; (c) process all payroll for the TFDC stores; (d) procure all advertising for the TFDC stores; (e) provide all central office and data processing functions; (f) permit TFDC to use Gold Circle's distribution centers at a reasonable charge; and (g) prepare and maintain monthly income statements and balance sheets for TFDC.

37. In April, 1985, Federated liquidated TFDC and merged it into Federated. Prior to that time, Federated had expressed no intention of liquidating TFDC. Following the liquidation, Federated acquired all of TFDC's assets and liabilities.

38. On the date of its liquidation, TFDC was a solvent corporation. While the balance sheet of TFDC effective February 2, 1985 indicated that TFDC's debt exceeded its assets, the balance sheet was incomplete and inaccurate on three counts: (1) nearly $5 million in goodwill was erroneously excluded from the TFDC balance sheet and recorded on Federated's balance sheet; (2) in excess of $25 million was classified as a liability when it was in fact a equity contribution; and (3) Twin Fair's prepaid pension expenses were erroneously recorded on Gold Circle's financial statement. A correction of these inaccuracies showed that, on the date of liquidation, TFDC's assets exceeded its debts.

39. Following the liquidation of TFDC, Federated used the NOLs, in the amount of $26,963,028 as a deduction on its tax return for the taxable year ending January 31, 1986.

Although TFDC was liquidated in 1985, the seven Buffalo stores remained in operation as Gold circle stores until 1988 when the entire Gold Circle Division was liquidated.

*Conclusion*

40. Based on the entire record, the Court finds that a preponderance of the evidence establishes that the primary purpose of Federated's transaction with TFDC was not the avoidance of federal income tax through the acquisition of the NOLs. The Court also finds that following the acquisition, TFDC substantially carried on the business as it did prior to the acquisition. Further, the Court finds that on the date of liquidation, TFDC was a solvent corporation. Finally, the Court finds that the amount of the NOLs on the date of Federated's acquisition of TFDC was $26,963,028.

## CONCLUSIONS OF LAW

The Court has jurisdiction over this action pursuant to 11 U.S.C. §§ 502(b) and 505(a) and 28 U.S.C. §§ 157 and 1334, and the General Order of Reference entered in this District. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

1. The Internal Revenue Service has the burden of proof in this action. This issue was recently resolved in the Southern District of Ohio in a case holding that even

though the IRS's filing of a proof of claim is *prima facie* evidence of its validity, if that claim is challenged by the debtor, the IRS ultimately carries the burden of persuasion. *In re Eversole*, 1990 WL 349992, 1990 Bankr.LEXIS 1859 (Bankr.S.D.Ohio Aug. 13, 1990). The *Eversole* decision, which is controlling law here, is in accord with the other decisions that have been rendered on this issue within this Circuit. *See, In re Premo*, 116 B.R. 515, 524 (Bankr.E.D.Mich.1990); *In re Butcher*, 100 B.R. 363, 367 (Bankr.E.D.Tenn.1989); *on reconsideration* 109 B.R. 775 (1990) *In re Unimet Corp.*, 74 B.R. 156, 166 (Bankr. N.D.Ohio 1987); *See also, In re Slodov*, 75–2 U.S. Tax Cas. (CCH) para. 9,829, at 88,653 (N.D.Ohio Sept. 8, 1975), *rev'd on other grounds*, 552 F.2d 159 (6th Cir.1977), *rev'd on other grounds*, 436 U.S. 238, 98 S.Ct. 1778, 56 L.Ed.2d 251 (1978). These decisions hold that the government must be treated like any other party claimant in the bankruptcy courts and is not subject to any special exception.

2. Because of the dispute over the burden of proof, Federated assumed the burden of persuasion on the Twin Fair tax attributes. *See, e.g., In re Premo*, 116 B.R. 515, 516 (endorsing this approach). Given the weight of the evidence adduced by Federated, the Court finds that the disposition of this matter does not turn on the issue of which party—the IRS or Federated—actually bears the burden of persuasion. Rather, regardless of which party bears the burden of persuasion, the Court finds that Federated is entitled to deduct the Twin Fair tax attributes.

*Section 269 Analysis*

▪ 3. Disallowance under 26 U.S.C. § 269 cannot be applied unless the tax avoidance motive is the principal purpose for the acquisition and outranks or exceeds in importance any other purpose. *VGS Corp. v. Commissioner*, 68 T.C. 563, 595 (1977); *D'Arcy–MacManus v. Commissioner*, 63 T.C. 440, 449 (1975). If a transaction serves both legitimate business and tax purposes, the tax avoidance purpose must outrank the business purpose before § 269 will be applied. *PEPI, Inc. v. Com-*

*missioner*, 448 F.2d 141, 144 (2d Cir.1971). Under § 269, the principal purpose of an acquisition is determined by subjective evaluation of the taxpayer's motives. *Glen Raven Mills, Inc. v. Commissioner*, 59 T.C. 1 (1972); *Power–Line Sales, Inc. v. Commissioner*, 36 T.C.M. (CCH) 190, 194 (1977). The motive and intent of top management officials of the acquiring company reveals the taxpayer's intent. *Princeton Aviation Corp. v. Commissioner*, 47 T.C.M. (CCH) 575, 584 (1983); *U.S. Shelter Corp. v. United States*, 87–2 U.S.Tax Cas. para. 9580 (Cl.Ct.1987); *D'Arcy–MacManus v. Commissioner*, 63 T.C. 440, 450 (1975).

▪ The Gold Circle management wanted to acquire TFDC because it was an excellent opportunity to establish a Gold Circle business presence in the Buffalo area. The TFDC acquisition complied with the expansion objectives embodied in the Gold Circle five-year plan. Thus, the motive of Gold Circle management was principally non-tax because a "formally documented policy of expansion or diversification through acquisition rather than through internal growth tends to establish a non-tax avoidance motive." *U.S. Shelter v. United States*, 87–2 U.S.Tax Cas. para. 9588 (Cl.Ct.1987) at 89,765.

4. To counter the overwhelming evidence of the dominance of non-tax motives, the IRS points to several discussions of the NOLs by corporate executives during the course of negotiations. By and large, the quotes used by the IRS were often equivocal, cautionary, inconclusive or counterbalanced by overwhelming contrary opinion of other corporate advisors based on thorough analysis.

▪ In addition, these discussions do not render tax avoidance the principal purpose behind the TFDC acquisition. Consideration by corporate officials of the tax ramifications of an acquisition is not, by itself, indicative of tax avoidance but is "simply intelligent business planning." *U.S. Shelter Corp. v. United States*, 87–2 U.S.Tax Cas. para. 9580 at 89,765 (Cl.Ct.1987).

5. Twin Fair refused to sell TFDC's assets and insisted on a stock purchase. Thus, Federated was forced to consider the NOLs in the negotiations. Twin Fair's refusal to sell assets instead of stock, in light of Federated's desire to acquire assets, is *prima facie* evidence that a legitimate business purpose existed for the transaction and renders § 269 inapplicable. *Baton Rouge Supply Co., v. Commissioner*, 36 T.C. 1, 13–14 (1961). *See also, Princeton Aviation Corp. v. Commissioner*, 47 T.C.M. (CCH) 575, 585 (1984); *Superior Garment Co. v. Commissioner*, 24 T.C.M. (CCH) 1571, 1577 (1965).

6. Gold Circle made substantial efforts to make the TFDC entity profitable, including the infusion of nearly $10 million in capital into the seven TFDC stores, all of which was anticipated well before the acquisition was completed. The stores were operated for three years before TFDC was liquidated into Federated and the Gold Circle stores remained open until 1988, when the Gold Circle Division was liquidated. Efforts to make an acquired corporation profitable substantiates that the principal purpose behind an acquisition was not tax avoidance. *U.S. Shelter*, 87–2 U.S.Tax Cas. at 89,776–77; *Naeter Bros. Publishing Co. v. Commissioner*, 42 T.C. 1, 8 (1964); *Arwood Corp. v. Commissioner*, 30 T.C.M. (CCH) 6, 21 (1971). Also, continuation of the acquired business for two or more years reveals a bona fide non-tax motivated business purpose. *U.S. Shelter*, 87–2 U.S. Tax Cas. at 89,775; *Naeter*, 42 T.C. at 8.

7. Reviewing the post-trial submissions in this case, one would reasonably be struck with the impression that the parties had not tried the same case. The IRS, in its narrow focus, seems to have forgotten that analyzing a transaction under § 269 requires an examination of *all* circumstances and events leading up to and following the acquisition. Treas.Reg. § 1.269.3(a)(2). *See also, Scroll, Inc. v. Commissioner*, 447 F.2d 612, 617 (5th Cir. 1971); *VGS Corp.*, 68 T.C. at 595; *D'Arcy-MacManus*, 63 T.C. at 451; *PEPI, Inc. v. Commissioner*, 52 T.C. 854, 862 (1969), *aff'd*, 448 F.2d 141 (2d Cir.1971).

8. As a final note on the case law surrounding § 269, we find the *U.S. Shelter* case to be very analogous to this case. It also presents a useful framework for legal analysis of § 269 issues.

In *U.S. Shelter*, the taxpayer corporation, U.S. Shelter, had acquired a second corporation, FPC, which operated numerous lines of business and had substantial operating losses. Despite post-acquisition attempt to make FPC's operating divisions profitable, U.S. Shelter eventually terminated or sold many of the FPC divisions. In ruling that U.S. Shelter's principal motivation behind the FPC acquisition was business, the court utilized a two-pronged analysis: whether the acquiring corporation had a policy of tax avoidance; and, whether four factors existed establishing a valid business purpose. Those four factors are: (1) acquisition of a going concern rather than a shell corporation; (2) continuation of the acquired business; (3) efforts to make the acquired business profitable; and (4) the value of the acquired business as compared to the NOLs. *U.S. Shelter, supra*.

Our analysis above covers most of these points. There is not a scintilla of evidence of an improper Federated tax avoidance policy. In like manner, the first three criteria of the business purpose test were easily met by Federated.

The final factor corroborating a valid business purpose is the value of the acquired business versus the magnitude of NOLs. Under § 269(c), even if the magnitude of NOLs are large as compared to book value, it remains only one of many factors and is not, by itself, dispositive. *U.S. Shelter*, 87–2 U.S.Tax Cas. at 89,778. *Accord, Stange Co. v. Commissioner*, 36 T.C.M. (CCH) 31, 39 n. 13 (1977); *Daytona Beach Kennel Club*, 69 T.C. at 1032.

There is even some authority for the proposition that the comparison of these values is only marginally related to the consideration of valid business purpose. *D'Arcy-MacManus*, 63 T.C. at 453; *Glen Raven Mills, Inc. v. Commissioner*, 59

T.C. 1, 16 (1972). *See also Industrial Suppliers, Inc. v. Commissioner,* 50 T.C. 635, 646 (1968); *Baton Rouge Supply,* 36 T.C. at 13.

Thus, if other non-tax motives prevail, the ratio of business value to the value of the NOLs, even if established, cannot defeat those motives.

9. Based upon the factual record, the Court finds that the principal purpose of the transaction was business expansion and not the avoidance of federal income tax, and therefore finds the arguments of the IRS under § 269 to be without merit.

*Section 382 Analysis*

■ 10. Under 26 U.S.C. § 382, NOLs are disallowed if the acquiring corporation fails to carry on substantially the same business. I.R.C. § 382(a)(1)(C) (1978). Section 382 is inapplicable in the present case because TFDC substantially carried on the same business following the acquisition. At the time of the acquisition, TFDC was a mass merchandiser offering a combination of hard and soft goods in a self-service environment. After the acquisition, under its management agreement with TFDC, Gold Circle not only continued these operations but expanded the mass merchandising efforts of TFDC.

11. The IRS argued that at the time of the acquisition, TFDC was merely a shell corporation. The facts showed that TFDC was not a shell when it was acquired by Federated. Not only was TFDC a profitable corporation in the recent past, but Merrill Lynch had predicted more profitable periods in the future. TFDC was the dominant retailer in Western New York, owning and operating 15 highly visible stores throughout the Buffalo area. While several of these stores were subsequently closed, TFDC consolidated merchandise in its successful stores and was fully operational as a retailer at the time of the transaction. Moreover, throughout the period of time in question the Twin Fair name and reputation had remained firmly entrenched in the Buffalo retailing market.

The IRS's argument that Federated's failure to wait for a potential TFDC bankruptcy to acquire the desired assets reveals a tax avoidance scheme is simply untenable. *See, Daytona Beach Kennel Club v. Commissioner,* 69 T.C. 1015, 1029 (1978). The IRS cannot rely on arguments involving unprovable contingencies.

■ Finally, even though a business may ultimately prove unprofitable and require liquidation, such events do not diminish the validity of the post-acquisition operations and the efforts to make the business profitable. *U.S. Shelter,* 87–2 U.S.Tax Cas. at 89,764.

12. Some changes were made when Gold Circle began to operate the former Twin Fair stores. In no instance do any of these changes trigger the applicability of § 382 or run afoul of the objective criteria in Treasury Regulation § 1.382(a)–1(h)(5). That regulation focuses on changes in the acquired corporation's employees; changes in the corporation's plant; changes in the corporation's equipment; changes in the corporation's location; changes in the corporation's product; and changes in the corporation's customers. Treas.Reg. § 1.382(a)–1(h)(5). Analyzing these six factors in light of the transaction at issue, it is clear that Federated substantially carried on the business of TFDC.

The acquisition by Federated did not result in a substantial change in TFDC's operations. Following the acquisition, Gold Circle re-hired many of the former TFDC employees. In addition, the locations of the stores obviously remained the same, and the basic "equipment" in the stores did not change, though Federated remodeled and improved the stores' facilities. Moreover, the customers of TFDC remained the same, as this was one of the primary objectives of Federated in acquiring TFDC. Perhaps most importantly, as stated earlier, at all times the seven Buffalo stores remained mass merchandising department stores offering a variety of hard and soft line goods.

The only difference between the product lines offered by the old TFDC stores and the Gold Circle stores was that Gold Circle did not continue the operation of a grocery department with perishable food items.

Gold Circle followed the industry trend in the 1980's by eliminating such operations from all of its stores. Thus, Gold Circle eliminated the perishable grocery product lines of the old TFDC stores, but continued to sell non-perishable grocery items, such as candies and paper goods. The elimination of the perishable grocery section in the Buffalo stores, however, did not alter the basic character of TFDC's business, which was mass merchandise retailing.

*Solvency*

13. In 1985, TFDC was properly liquidated and dissolved pursuant to I.R.C. § 332. As the Court has already found, TFDC was a solvent corporation upon its liquidation. Examination of TFDC's true balance sheet prior to the date of liquidation confirms this finding as the addition of goodwill and pension plan expenses, which were inadvertently omitted from the balance sheet, shows TFDC with positive equity at the time of liquidation. Moreover, while the balance sheet erroneously classified inter-company advances as debt, advances made by a shareholder to a controlled corporation should be characterized as equity and not debt for federal tax purposes where no true debtor-creditor relationship exists. *Inductotherm Indus., Inc. v. C.I.R.*, 48 T.C.M. 167, (CCH) para. 41,244 at 191 (1984).

*Fixtures*

14. Some of the arguments by the IRS alluded to the arrangements made between Gold Circle and Twin Fair regarding unwanted fixtures as indicating an improper tax avoidance motive on the part of Federated. We find the evidence is wholly inconclusive regarding the tax treatment of the fixtures. Much of the informal arrangements over unwanted fixtures was dependent on the speculative liquidation value of those fixtures. This part of the case amounted to an insubstantial digression from the main issues in the case. The evidence on this point hardly contributed to the efforts of the IRS to sustain its burden of proof and did nothing to diminish the strength of Federated's case.

*The Amounts of the Tax Attributes*

15. Finally, the Government claims that Federated has failed to establish the amount of the NOLs at issue. The Court has already found, based on the record before us, the amount of the NOLs to be $26,963,028. Without any evidence to the contrary, the Court finds the IRS's argument to be without merit.

*Conclusion*

The Court concludes that the IRS has failed to carry the burden of proof with respect to the critical factual issues before it. Regardless, the Court concludes that Federated, who tried the matter as if it bore the burden of proof, has carried that burden of proof with respect to the facts from which this Court's legal conclusions follow.

The Court concludes that the IRS's proofs of claim with respect to the deductibility of the Twin Fair tax attributes shall be DISALLOWED, and the Debtors' objections to those claims are GRANTED.

IT IS SO ORDERED.