In the Matter of FEDERATED DEPARTMENT STORES, INC., et al., Debtors.

UNITED STATES of America, Appellant,

v.

FEDERATED DEPARTMENT STORES, INC., et al., Appellees.

No. C–1–93–175.
Bankruptcy No. 1–90–130.

United States District Court,
S.D. Ohio,
Eastern Division.

July 18, 1994.

Gerald C. Miller, Washington, DC, for appellant.

Jeffrey Alan Lipps, Columbus, OH, for appellees.

### OPINION AND ORDER

GEORGE C. SMITH, District Judge.

The government appeals the bankruptcy court's decision allowing Federated Department Stores, Inc. ("Federated") to deduct certain tax attributes.[1] This action arises out of Federated's acquisition of Twin Fair Distributors Corporation's ("TFDC") stock in May 1982. Following this stock purchase, the seven TFDC stores Federated acquired were operated as Gold Circle stores, a retailing division of Federated. TFDC operated as a separate subsidiary of Federated. In April 1985, Federated liquidated and dissolved TFDC. Consequently, Federated acquired all of TFDC's assets and liabilities, including certain net operating losses ("NOLs") of TFDC. The stores continued to operate as part of Federated's Gold Circle

---

1. On January 15, 1990, Federated Department Stores, Inc. filed voluntary petitions for relief under chapter 11 of the bankruptcy code.

division until Federated sold all of its Gold Circle stores in 1988.

This dispute centers around Federated's use of the NOLs. In its 1986 tax return, Federated deducted the NOLs acquired from TFDC. The Internal Revenue Service ("IRS") disallowed Federated's use of these tax attributes and filed proofs of claim against Federated. Federated filed an objection to the proofs of claim. The government appeals the bankruptcy court's decision sustaining Federated's objection to the government's claim for unpaid taxes. *In re Federated Dep't Stores*, 135 B.R. 962 (Bankr. S.D.Ohio 1992).

This Court has jurisdiction to review on appeal the bankruptcy court's decision pursuant to 28 U.S.C. § 158(a).

For the reasons that follow, the bankruptcy court's decision is **AFFIRMED.**

### I.

### A.

In its appellate brief, the government incorporates by reference the findings of fact contained in the bankruptcy court's decision. (Doc. 5, p. 4). The government then sets forth "additional facts from the record." The government represents that these additional facts are consistent with the bankruptcy court's findings. Federated argues that the government's statement of facts either grossly distorts or simply misstates the factual record.

Given that the bankruptcy court's factual findings are undisputed, the relevant facts from the bankruptcy court's decision are set forth below. The government's "additional

facts" and Federated's response to these additional facts will be noted when necessary.

### B.

Federated formed its Gold Circle division in the early 1970's. Gold Circle was Federated's entry into the mass merchandising business, which included stores offering moderately priced lines of hard and soft goods with a high degree of customer self-service.

Federated operated Gold Circle as one of its retailing divisions. Federated's divisions operate separately from Federated but are not separate subsidiaries or separate taxable entities. As of June 1981, Gold Circle operated 41 stores in the Midwest and Northeast. In 1981, Gold Circle continued to have a significant gap in its operating territory, particularly in the Northeast.

On July 8, 1981, Gold Circle issued a Long Range Plan (1981–1986). Gold Circle established plans to expand in the Northeast market. Buffalo, New York was determined to be an ideal location for Gold Circle under the criteria of the Long Range Plan. The Plan also stated that the acquisition of an established business would allow expansion at approximately one half the investment required for a new store.[2]

TFDC was a subsidiary of Twin Fair, Inc. ("Twin Fair"), a publicly traded corporation. TFDC, like Gold Circle, was a discount retailer offering a broad range of national brand name merchandise at promotional prices.[3] In 1980, after eighteen profitable years, TFDC was the leading discount retailer in western New York, holding nearly a 50% market share.

TFDC began to experience a financial downturn in 1980.[4] TFDC experienced in-

---

**2.** The Plan listed six criteria for expansion: (1) location in the Northeast quadrant of the United States, exclusive of New England and New York City; (2) markets with projected population growth from 1980 to 1990 or with combined population, demographic, and competitive factors which would produce a satisfactory return on investment; (3) emphasis on markets where upscale mass merchandisers were not presently in place or where mass merchandiser square footage per capita was low; (4) capability of identifying and controlling a sufficient number of store sites in a new market so that expenses necessary in the market would satisfy return on

investment and discounted cash flow requirements; (5) a 21% incremental return on investment in the fifth full year of operation; and (6) a 15% discounted cash flow return in the first five years.

**3.** The government adds that most of TFDC's stores in New York had supermarket departments and that supermarket sales represented approximately 40% of each store's sales.

**4.** According to the bankruptcy court, this downturn was attributable to double digit inflation,

creased erosion of its profit margins. To reduce its increasing bank debt, TFDC sold its Ohio stores in the second quarter of 1981.

From 1980 to 1982, TFDC generated net operating losses. For the year ending December 31, 1981, Twin Fair's tax return showed NOLs of $18,900,000, the majority attributable to TFDC. In 1982, Twin Fair incurred an additional $10 million in NOLs. For the year ending December 31, 1982, Twin Fair's tax return showed NOLs of $25,-755,657. TFDC had an investment tax credit carry forward of $934,061.

In September 1981, Twin Fair decided to sell the remaining operations of TFDC.[5] Twin Fair retained Merrill Lynch to sell TFDC. In late 1981, Federated and a variety of other retailers received an unsolicited inquiry from Merrill Lynch concerning the possible acquisition of TFDC. Merrill Lynch prepared a prospectus, favorably describing TFDC's current business and portraying TFDC as an excellent candidate for acquisition. Merrill Lynch acknowledged that TFDC had suffered some economic setbacks in 1980, but projected that TFDC could be made profitable through the significant overhead savings that could be achieved if TFDC was integrated with an existing retail mass merchandise organization. Merrill Lynch emphasized TFDC's favorable position in the Buffalo market, its cost effective advertising campaign, and that TFDC owned its own real estate.[6]

Gold Circle began an investigation of TFDC after receiving the prospectus. After visiting the Buffalo stores, Gold Circle's Chairman concluded that the TFDC acquisition fit squarely within Gold Circle's expansion program for the following reasons: (1) TFDC was in the appropriate geographical region, (2) TFDC was in a relatively low competitive market, (3) TFDC was a broadly based mass merchandiser, and (4) the TFDC stores were already established store locations.[7]

A number of Federated and Gold Circle departments then analyzed TFDC. Their research recommended that Federated acquire only the most profitable locations.

Based on the analyses, Gold Circle and Federated began negotiations in fall 1981.[8] Federated and Gold Circle expressed a desire to purchase only the assets of TFDC. It was not the practice of Federated or Gold Circle to acquire the stock of a company. Twin Fair was not willing to sell only assets because it desired to divest TFDC in its entirety.[9]

Another topic of negotiations was the number of stores Federated would acquire. In the end, Federated acquired seven of the fifteen available stores. These stores were demographically acceptable and had been, and were projected to be, the most profitable.

In January 1982, TFDC's net operating losses became an issue in negotiations. According to the bankruptcy court, the NOLs were an important aspect of the transaction for Twin Fair because they were a vehicle for Twin Fair to obtain value. The bankruptcy court also concluded that the NOLs were never the principal or even a significant sub-

---

record interest rates, and increases in minimum wage.

5. The bankruptcy court found that at that time TFDC still had a strong franchise, the goodwill of loyal customers, and some of the best store locations in western New York.

6. The government states that the prospectus informed readers that TFDC had millions of dollars in investment tax credits (ITCs) and NOLs available to shelter future income, and that "retention of these tax shields ... is contingent on the form of transaction undertaken by a purchaser."

7. The bankruptcy court determined that acquiring the TFDC stores satisfied all the criteria of Gold Circle's Long Range Plan.

8. The government states that Federated acknowledged the presence of ITCs and NOLs in a September 16, 1981 letter.

9. The government states that Federated's tax attorney advised, in January 1982 at an internal meeting, that "if you wanted the NOLs, you are going to have to make this a stock transaction." Moreover, the government contends that in November 1981 and January 1982 Federated asked TFDC to stay out of bankruptcy in order to save tax losses. In response, Federated states that their chief financial officer testified that no such direction was given.

ject of the negotiations for Federated or Gold Circle. Even though the NOLs were considered part of the analysis of the acquisition for Federated, according to the bankruptcy court, the deal was structured so Federated would receive no economic benefit if the NOLs were realized. The bankruptcy court concluded that the NOLs did not weigh heavily in Federated's decision to approve the acquisition of TFDC.[10]

In March 1982, a Capital Expenditure Request ("CER") was submitted for the TFDC acquisition.[11] The CER indicated a return on investment of 46.1%, which was higher than Gold Circle's standard of 21%. The CER also indicated a discounted cash flow return of 25.5%, which was also higher than Gold Circle's benchmark of 15%. Further, the CER indicated that if the benefit of the NOLs was not realized, the impact on the discounted cash flow was only 0.5%.[12]

The government submits that the CER also showed that TFDC had a pre-tax NOL of $20 million and that in the event of acquisition, Gold Circle intended to write off $6.4 million in unusable assets (fixtures and equipment). The CER discussed Gold Circle leasing some of the locations, and showed that liabilities exceeded assets by $2,916,000.

According to the government, the CER projected that Gold Circle would save $13.2 million in taxes during the first three years by using the $20 million in NOLs and $6.4 million in write-offs from fixtures.

On March 25, 1982, Federated's Board of Directors approved the acquisition of TFDC stock. The government submits that the Board members discussed the tax attributes before approving the deal.

Moreover, the government states that the April 28, 1982 minutes from the Twin Fair Board of Directors' meeting reveal that difficulties were experienced in the negotiations regarding the tax loss credits and the legal ramifications. The minutes also reveal that if the contract was not executed by May 4, the appropriate action was to file for bankruptcy.

On May 5, 1982, Federated and Twin Fair entered into an Agreement of the Purchase and Sale of TFDC. Under the Agreement, Federated acquired the stock of TFDC in exchange for $550,000 cash; a non-interest bearing promissory note with a principal amount of $8.1 million due on August 3, 1988; a non-interest bearing contingent note with a principal amount of $5.4 million;[13] a $2 million loan to Twin Fair with a 12% annual interest rate to be repaid in 36 monthly installments beginning July 1, 1984; and a $500,000 loan to Twin Fair with a 12% annual interest rate to be repaid on February 3, 1983.

The government contends that Federated and Twin Fair had an unwritten agreement regarding the disposition of TFDC's fixtures. The government asserts that Federated planned on obtaining a $6.4 million write-off

10. The NOLs were discussed by members of Federated's negotiating team and examined internally at Federated. The bankruptcy court determined there were several reasons for this. First, Federated had never been involved in a transaction where NOLs were an issue. Second, Federated was constantly under IRS audit, therefore, Federated wanted to ensure that the NOLs would pass IRS scrutiny. Third, Federated bore all the risk relating to the NOLs and wanted to ensure that its risk was minimized. In its brief, Federated concedes that "[t]here is no dispute that Federated analyzed and discussed the NOLs; good tax and business practice demanded as much."

11. A CER is used for all capital expenditures in excess of $1 million. The CER projected capital expenditures of nearly $7.5 million with total expenditures in excess of $15 million. Federated states that it expected the TFDC acquisition would result in substantial capital expenditures

well in excess of the initial purchase price, and that this is not the attitude of a buyer whose principal objective was the acquisition of NOLs.

12. The government contends that this calculation is incorrect.

13. The $5.4 million promissory note was contingent on two factors. First, the note would become null and void if TFDC did not renew the seven store leases with Twin Fair in 1988. Second, the note provided that $3.5 million of the principal would be payable "at a rate of one dollar ($1.00) for every two dollars ($2.00) of Twin Fair NOL carryover realized in excess of Twenty Million Dollars ($20,000,000.00)."

The government notes that the value of the two promissory notes were increased to $8.1 million and $5.4 million respectively from the original proposed amounts because the value of the tax attributes had increased.

from the abandonment of fixtures; thus, for tax reasons, Federated wanted to obtain title to all fixtures at closing.[14]

Also, Federated entered into a five-year lease with Twin Fair for each of the seven stores. The leases provided for a minimum annual payment of $1.54 million to Twin Fair and contained four five-year options to renew which would extend the leases through 2008. Federated exercised the initial options to renew the seven leases in 1988.[15]

In acquiring the stock of TFDC, Federated obtained all of the assets and liabilities of TFDC, acquired the goodwill of TFDC valued in excess of $4 million, and received the surplus from TFDC's pension plan.

Originally, the transaction was to be closed on June 1, 1982. However, discrepancies in TFDC's accounting records and problems with TFDC's banks delayed closing until August 3, 1982. During this delay, TFDC's financial situation deteriorated. TFDC closed the Buffalo stores not to be leased by Federated and consolidated the inventory in the stores remaining open.

After the August closing, Federated began renovating and remodeling the stores into the Gold Circle prototype.[16] Gold Circle was not involved in the grocery business and decided not to re-open the TFDC grocery departments which had been closed early 1982. During renovations, all seven Buffalo TFDC stores remained open under the Twin Fair name. Because of reductions in inventory, however, only three of the Buffalo stores remained open by late October 1982.

The re-opening, which took place in November 1982, was successful, attaining a sales volume of $1.5 million. For a period after the re-opening, the Buffalo stores had the best sales performance within the Gold Circle division. Over the life of the stores, however, sales performance fell to slightly below the Gold Circle average. Nevertheless, the Buffalo stores consistently averaged sales in excess of $10 million per year.

Following the acquisition, Federated continued operating TFDC as a separate corporate entity. TFDC maintained separate books and records.[17]

Gold Circle and TFDC executed a management agreement to ensure that the stores would be operated in a manner similar to the other Gold Circle stores. Gold Circle agreed to operate the seven TFDC stores. Under the agreement, Gold Circle conducted the day-to-day operations of the stores on behalf of TFDC, and TFDC incurred the costs of these operations.[18]

In April 1985, Federated liquidated TFDC and merged it into Federated. After liquidation, Federated acquired all of TFDC's assets and liabilities. The bankruptcy court concluded that on the date of its liquidation, TFDC's assets exceeded its debts.[19]

14. The government also states that Federated planned to obtain a $3 million tax benefit from the imputed interest deduction relating to the two promissory notes used to purchase the stock. In response, Federated states that this is the first time the government has raised the imputed interest deduction and that the government admitted that the disallowance of the NOLs are the only benefits directly at issue.

15. The leases stated that Federated would be responsible for maintaining and repairing the buildings, mechanical facilities, and adjacent property. The leases had an override provision paying Twin Fair a bonus if TFDC's sales exceeded their projected amounts. $65,000 was paid to Twin Fair the first year of operation.

16. Gold Circle budgeted and spent approximately $1 million per store to renovate the seven stores. Also, Gold Circle budgeted $250,000 per store for pre-opening expenses, including the hiring of 1,800 employees. About 50% of the new work force, including management, consisted of former TFDC employees.

17. According to the bankruptcy court, because TFDC was a separate corporation, it was anticipated that the NOLs would be used to offset TFDC's income, not Federated's.

18. The agreement provided that Gold Circle would perform the following activities on behalf of TFDC: (1) order all merchandise and non-merchandise for the stores and charge TFDC for the purchases, (2) process all payroll for the TFDC stores, (3) procure all advertising for the TFDC stores, (4) provide all central office and data processing functions, (5) permit TFDC to use Gold Circle's distribution centers at a reasonable charge, and (6) prepare and maintain monthly income statements and balance sheets for TFDC.

19. Although TFDC's balance sheet on February 2, 1985 indicated that TFDC's debt exceeded its

Following the liquidation of TFDC, Federated used NOLs amounting to $26,963,028 as a deduction on its tax return for the taxable year ending January 31, 1986.

The seven Buffalo stores remained in operation as Gold Circle stores until 1988 when the entire Gold Circle division was liquidated.

## II.

Bankr.R. 8013 provides in part that "findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard must be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Under this standard, a bankruptcy court's findings will not be overturned as long as the judge's inferences are reasonable and supported by the evidence. *In re Southern Industrial Banking Corp.,* 809 F.2d 329, 331 (6th Cir.1987).

If a bankruptcy court's account of the evidence is plausible in light of the record viewed in its entirety, a district court may not reverse it even though convinced that had it been sitting as a trier of fact, it would have weighed the evidence differently. *See Anderson v. Bessemer City,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985). In somewhat more colorful terms:

> "To be clearly erroneous, ... a decision must strike us as more than just maybe or probably wrong; it must ... strike us as wrong with the force of a five-week-old, unrefrigerated dead fish."

*United States v. Perry,* 908 F.2d 56, 58 (6th Cir.), *cert. denied,* 498 U.S. 1002, 111 S.Ct. 565, 112 L.Ed.2d 571 (1990) (quoting *Parts and Elec. Motors, Inc. v. Sterling Elec., Inc.,* 866 F.2d 228, 233 (7th Cir.1988), *cert. denied,* 493 U.S. 847, 110 S.Ct. 141, 107 L.Ed.2d 100 (1989)).

A bankruptcy court's conclusions of law, however, are reviewed *de novo. Ste-*

*phens Industries, Inc. v. McClung,* 789 F.2d 386, 389 (6th Cir.1986).

## III.

To determine whether Federated may deduct the NOLs acquired from TFDC, the Court must address two issues:

I. Whether a corporation continued to carry on substantially the same business as that conducted before acquisition, pursuant to 26 U.S.C. § 382(a); and

II. Whether the principal purpose behind the acquisition was evasion or avoidance of federal income tax, pursuant to 26 U.S.C. § 269(a).

## IV.

In order for Federated to carryover and deduct the NOLs acquired from TFDC, a business substantially the same as that conducted before the acquisition must have continued to be carried on.

Under 26 U.S.C. § 172, net operating losses incurred in business can be carried back three years before the loss year, and then carried forward fifteen years after the loss year. These carryovers reduce the taxpayer's taxable income each year the deduction is taken.

In *Libson Shops, Inc. v. Koehler,* 353 U.S. 382, 386, 77 S.Ct. 990, 993, 1 L.Ed.2d 924 (1957), the U.S. Supreme Court stated that the carryover provisions

> were enacted to ameliorate the unduly drastic consequences of taxing income strictly on an annual basis. They were designed to permit a taxpayer to set off its lean years against its lush years, and to strike something like an average taxable income computed over a period longer than one year.

The Supreme Court imposed a limitation on net operating loss carryovers based on the "continuity of business" theory. *Id.* The taxpayer in *Libson Shops* was a corporation into which sixteen other corporations, all re-

---

assets, the bankruptcy court stated that it was incomplete and inaccurate on three counts: (1) nearly $5 million in goodwill was excluded from TFDC's balance sheet and recorded on Federated's; (2) more than $25 million was classified as

a liability when it was an equity contribution; and (3) Twin Fair's prepaid pension expenses were erroneously recorded on Gold Circle's financial statement.

tail stores, were merged. The successor corporation sought to carryover the NOLs of three of the absorbed corporations. The Court disallowed the carryovers because "the income against which the offset is claimed was not produced by substantially the same businesses which incurred the losses." *Id.* at 390, 77 S.Ct. at 994.

*Libson Shops* was decided under the 1939 Code. In 1954, Congress enacted 26 U.S.C. § 382, codifying a limitation on NOLs. Section 382 disallows. net operating loss carryovers if (1) there was a 50% change in ownership of the corporation ("Change in Ownership"), and (2) the corporation did not continue to carry on a trade or business substantially the same as that conducted before any change in stock ownership ("Change in Business"). 26 U.S.C. § 382(a) (1954).[20]

■ The government and Federated disagree as to the purpose behind the limitations on NOL deductions. The government argues that although some of the principles of *Libson Shops* were superseded by § 382, the legislative intent in enacting the carry forward provisions was not.[21] The government maintains that the continuity of business tests under both *Libson Shops* and § 382 were designed to prevent the trafficking of NOLs by persons other than those who incurred the loss.

Federated submits that *Libson Shops* was decided under the 1939 Code, which provided that "the taxpayer" who incurred the loss was the only party entitled to a NOL carryover. *Libson Shops*, 353 U.S. at 385, 77 S.Ct. at 992. Federated contends that the continuity of business test under *Libson Shops* was based on the limiting language in the statute ("the taxpayer"). According to Federated, § 382 expressly permits the use of operating losses unless specifically prohib-

ited, and that in enacting § 382, Congress provided an objective test under which a "successor corporation [may] step into the 'tax shoes' of its predecessor corporation without necessarily conforming to artificial legal requirements which now exist under court-made law." (Doc. 7, p. 18) (quoting H.Rep. No. 1337, 83rd Cong., 2d Sess. (1954), *reprinted in* 1954 U.S.Code Cong. & Ad. News 4025, 4066–67; S.Rep. No. 1622, 83rd Cong., 2d Sess. (1954), *reprinted in* 1954 U.S.Code Cong. & Ad.News 4629, 4683).

The United States Court of Appeals for the Sixth Circuit has explained the purpose behind § 382. In *Frederick Steel Co. v. Comm'r*, 375 F.2d 351, 352–53 (6th Cir.), *cert. denied*, 389 U.S. 901, 88 S.Ct. 219, 19 L.Ed.2d 217 (1967), the Sixth Circuit stated that

> Congress ... sought, in 1954, a new fully integrated revenue code. Both House and Senate Committees ... reported ... that 'Present practice rests on courtmade law which is uncertain and frequently contradictory. Moreover, whether or not the carry-over is allowed should be based on economic realities rather than upon such artificialities as the legal form of reorganization.' U.S.Cong. and Adm.News, 1954, Vol. 3, p. 4066 (House Report), p. 4683 (Senate Report). Accordingly, after years of research, Congress adopted such a code in the Internal Revenue Code of 1954.

Also in *Frederick Steel,* the Sixth Circuit observed

> it was the clearly expressed intention of Congress to attempt to bring some order out of chaos, and, in effect, to countenance "trafficking" in operating loss carry-overs except as affected by the special limitations of Section 382....

---

**20.** Because of interpretative uncertainties, Congress abolished the "change in business" provision (requiring the corporation to carry on a business "substantially the same") and enacted a less demanding alternative in the Tax Reform Act of 1986. Boris I. Bittker & James S. Eustice, Federal Income Taxation of Corporations and Shareholders § 16.22, at 16–49, 16–50–51 n. 125. (5th ed. 1987).

The Tax Reform Act of 1986 was enacted on October 22, 1986, but became effective back to January 1, 1986. Federated deducted the NOLs

on its tax return for the taxable year ending January 31, 1986.

The government states that the 1986 amendments do not directly affect the issues in this case. (Doc. 5, p. 21 n. 15). The government and Federated both use the 1954 version of § 382 in this case. Accordingly, the Court will decide this case using the 1954 Code.

**21.** Congress was concerned with the fluctuating income of a single business.

*Id.* at 354 (quoting *Maxwell Hardware Co. v. Comm'r,* 343 F.2d 713, 718 (9th Cir.1965)). Examining the statute, the Sixth Circuit stated that "the 1954 Code provides that a net operating loss shall be net operating loss carry-over—without mention of the taxpayer's having sustained such a loss." *Id.*

Finally, in *Euclid–Tennessee, Inc. v. Comm'r,* 352 F.2d 991 (6th Cir.1965), *cert. denied,* 384 U.S. 940, 86 S.Ct. 1456, 16 L.Ed.2d 538 (1966), the Sixth Circuit stated:

> we cannot and do not read *Libson* into the 1954 Code, but its broad principles may be relevant except as the 1954 Code, under limited conditions, permits what the 1939 Code, construed by *Libson,* forbade.

In light of the above, the Court does not interpret the limitations on NOL carryovers as narrowly as the government or the *Libson Shops* decision. NOLs carryovers are not limited to the taxpayer that incurred them. NOLs may be carried over unless the conditions set forth in § 382 exist. The Court shall apply § 382 based on the limitations of the statute's language as provided in the 1954 Code.

## V.

The issue before the Court is whether Federated was entitled to carryover the NOLs TFDC incurred after it acquired TFDC. Applying § 382, both the government and Federated agree that there was a change in ownership. Therefore, the Court must decide whether the corporation continued to carry on a trade or business substantially the same as that conducted before the change of ownership. 26 U.S.C. § 382(a)(1)(C). The bankruptcy court found that TFDC carried on substantially the same business following the acquisition. *Federated,* 135 B.R. at 972.[22]

In its pertinent part, 26 U.S.C. § 382(a)(1)(C) states:

If, at the end of a taxable year of a corporation—

\* \* \* \* \* \*

> (C) such corporation has not continued to carry on a trade or business substantially the same as that conducted before any change in the percentage ownership of the fair market value of such stock,

the net operating loss carryovers, if any, from prior taxable years of such corporation to such taxable year and subsequent taxable years shall not be included in the net operating loss deduction for such taxable year and subsequent taxable years.

This means that a corporation may deduct NOLs if it continued to carry on a trade or business substantially the same as was conducted before the change in ownership.

■ When interpreting a statute, the Court must carry out the intent of Congress. *United States v. American Trucking Ass'n, Inc.,* 310 U.S. 534, 542, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940); *United States v. Underhill,* 813 F.2d 105, 111 (6th Cir.), *cert. denied,* 482 U.S. 906, 107 S.Ct. 2484, 96 L.Ed.2d 376, 483 U.S. 1022, 107 S.Ct. 3268, 97 L.Ed.2d 766, 484 U.S. 821, 108 S.Ct. 81, 98 L.Ed.2d 43, 484 U.S. 846, 108 S.Ct. 141, 98 L.Ed.2d 98 (1987). The normal rule of statutory interpretation is that a court first looks to the language of the statute. *United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981). "If the statutory language is unambiguous, in the absence of 'a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive.'" *Id.* (quoting *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980)). If the statutory language is ambiguous, the Court may refer to other sources for guidance. *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 737, 105 S.Ct. 1598, 1603, 84 L.Ed.2d 643 (1985); *Blum v. Stenson,* 465

---

**22.** The bankruptcy court stated:

At the time of the acquisition, TFDC was a mass merchandiser offering a combination of hard and soft goods in a self-service environment. After the acquisition, under its management agreement with TFDC, Gold Circle not only continued these operations but expanded the mass merchandising efforts of TFDC. *Id.*

U.S. 886, 896, 104 S.Ct. 1541, 1547–48, 79 L.Ed.2d 891 (1984).

The terms "continued to carry on" and "substantially the same" are not defined in the statute and are subject to interpretation. The Court will therefore refer to case law, legislative history, and tax regulations to interpret § 382.

In order to determine whether Federated may deduct the NOLs, the Court must decide: (a) whether a business "substantially the same" was carried on, and (b) whether TFDC "continued to carry on" that business.

### A.

■ The Court will first address whether a business "substantially the same" was carried on.

■ Applying § 382(a)(1)(C) and interpreting its language, the Sixth Circuit, in Comm'r v. Goodwyn Crockery Co., 315 F.2d 110, 112–13 (6th Cir.1963), stated:

> We do not obtain much help from the legislative history of Section 382. Congress used the word "substantially," but did not define it. We do not think that the business had to be conducted exactly the same after as before the change or the word substantially would not have been used. There may be some difference.

The Court concludes that some changes in the conduct of the business are permissible as long as the same type of business continues. Coast Quality Constr. Corp. v. United States, 325 F.Supp. 500, 505 (E.D.La.1971), aff'd, 463 F.2d 503 (5th Cir.1972).

The Code of Federal Regulations § 1.382(a)–1(h)(5) (1982) interprets § 382(a)(1)(C) and states

> [All] the facts and circumstances of the particular case shall be taken into account. Among the relevant factors to be taken into account are changes in the corporation's employees, plant, equipment, product, location, customers, and other items which are significant in determining whether there is, or is not, a continuity of the same business enterprise.

Consideration of the above listed factors shows that TFDC's post-acquisition business was substantially the same as the pre-acquisition business. The Court will examine each factor separately.

1. *Employees.* About 50% of the new work force, including management, consisted of TFDC employees. Because Federated retained half of TFDC's employees after the acquisition, this factor supports the conclusion that there was continuity of the same business enterprise.

2. *Plant.* TFDC did not have a plant, therefore the Court will instead consider the stores. Although the stores were remodeled, they still functioned as they had before acquisition—as mass merchandising stores. This factor supports the conclusion that there was continuity of the same business enterprise.

3. *Equipment.* The bankruptcy court determined that the basic equipment in the stores did not change. 135 B.R. at 972. Since the parties do not dispute this, this factor supports the conclusion that there was continuity of the same business enterprise.

4. *Product.* The same type of products were sold pre-acquisition and post-acquisition.[23] This factor supports the conclusion that there was continuity of the same business enterprise.

5. *Location.* The locations of the stores remained the same. This factor supports the conclusion that there was continuity of the same business enterprise.

6. *Customers.* The stores catered to the same type of customer. The bankruptcy court stated, "the customers of TFDC remained the same, as this was one of the primary objectives of Federated in acquiring TFDC." 135 B.R. at 972. This factor supports the conclusion that there was continuity of the same business enterprise.

Based on these factors, the objective facts and circumstances of this case demonstrate

---

**23.** The Court acknowledges that Gold Circle did not continue the grocery department but agrees with the bankruptcy court that this does not alter the basic character of TFDC's business—mass merchandise retailing. *See infra* at VI, B.

that a business "substantially the same" was carried on post-acquisition.

The Court must also consider these factors in light of the general objective of § 382(a):

> to disallow net operating loss carryovers where there is a purchase of the stock of a corporation and its loss carryovers are used to offset gains of a business *unrelated* to that which produced the losses.

26 C.F.R. § 1.382(a)–1(h)(5) (emphasis added). The Court concludes that the post-acquisition mass merchandising retail store business is related to the pre-acquisition mass merchandising retail store business.[24] The mass merchandising retail business conducted in the Buffalo area did not change enough after acquisition for the Court to conclude it is not "substantially the same" as it was before acquisition. Thus, the Court concludes that a trade or business "substantially the same" was carried on after the change in ownership.

### B.

■ The Court's inquiry, however, does not end here. The government argues that the Court must inquire whether the loss corporation (TFDC) carried on an *active* trade or business after the change in stock ownership. (Doc. 5 p. 22). The government states that the bankruptcy court erred in its continuity analysis by focusing on the operations of Federated's Gold Circle division, instead of the post-acquisition operations of TFDC. According to the government, Federated's Gold Circle division rather than TFDC carried on the business after the acquisition. The government contends that the post-acquisition operations of Federated's Gold Circle division and TFDC must be analyzed separately.

If the operations of TFDC and Federated's Gold Circle division are analyzed separately, then, according to the government, TFDC did not carry on an active trade or business because TFDC did not *directly* operate the stores; rather, Gold Circle operated the stores under the management agreement. The government maintains that if TFDC did not directly operate the stores then it cannot be concluded that TFDC continued to carry on a trade or business substantially the same as before acquisition.

The government cites *King v. Comm'r*, 458 F.2d 245 (6th Cir.1972), for the proposition that the operations of a subsidiary corporation must be separated from the operations of the parent corporation when determining whether the subsidiary was conducting a trade or business.[25] In *King* the Sixth Circuit states, "especially for tax purposes, separate corporations, even parent and wholly owned subsidiary, must be treated as separate entities, no matter how closely they may be affiliated. The separate corporate entity may not be disregarded." *Id.* at 247; *Freedman v. United States*, 266 F.2d 291, 294 (6th Cir.1959).

The Court agrees with the general rule set forth in *King*. Nevertheless, this rule does not apply to the facts of the instant case. The rule in *King* was applied for purposes of taxation; the court inquired into separateness to determine the taxability of dividend distributions between parent and subsidiary. For purposes of business continuity, however, the Court need not inquire into separateness.[26] The Court instead should inquire whether TFDC's mass merchandising business continued to be carried on substantially the same as it had been before acquisition.

---

24. The term "unrelated" does not mean that a loss carryover is not allowed to be taken by a corporation that is "not the exact same corporation as" the loss corporation. If Congress had intended such a strict interpretation, it would have flatly prohibited the carryover of NOLs after a change in ownership. Congress did not flatly prohibit NOL carryovers after a change in ownership, and instead enacted § 382. Consequently, the Court concludes that "unrelated" is akin to the requirement that a trade or business "substantially the same" continues to be carried on.

25. In *King*, the Sixth Circuit analyzed the "trade or business" requirement under 26 U.S.C. § 355. Federated contends that § 355 has no application to the operating loss carryover limitations in § 355.

26. This is true even though, ultimately, taxes will be affected by the determination whether there was business continuity.

The language of the statute supports the Court's reasoning. Section 382(a)(1)(C) provides that a corporation may deduct NOLs if it continued to carry on a trade or business substantially the same as that conducted before the acquisition. 26 U.S.C. § 382(a)(1)(C). Earlier, this Court determined that TFDC's mass merchandising business continued to be carried on substantially the same as it had before acquisition. *Supra* at V, A. Therefore, it follows that the NOLs may be deducted.

This case is unique when compared to, for example, *Euclid–Tennessee, Inc. v. Comm'r,* 352 F.2d 991 (6th Cir.1965), *cert. denied,* 384 U.S. 940, 86 S.Ct. 1456, 16 L.Ed.2d 538 (1966), because (1) the acquiring corporation, Federated, seeks to deduct the NOLs, and (2) who actually operated the stores is an issue.

In *Euclid,* the loss corporation, a brewery, was the corporation seeking to deduct the NOLs. In the instant case, the acquiring corporation, Federated, is the corporation seeking to deduct the NOLs. Neither the government nor Federated contends that § 382 permits only the loss corporation to deduct the NOLs, therefore this is not an issue. *Naeter Brothers Publishing Co. v. Comm'r,* 42 T.C. 1, 1964 WL 1179 (1975) (acquiring corporation permitted to deduct losses incurred by acquired loss corporation); *Baton Rouge Supply Co. v. Comm'r,* 36 T.C. 1, 13, 1961 WL 1103 (1961).

The government argues, however, that § 382 permits only the loss corporation, TFDC, to continue to carry on the trade or business.[27] Examining the language of the

statute, the Court concludes that § 382 does not require that the loss corporation continue to carry on the trade or business. Section 382 does not focus on who continues to carry on the trade or business. Rather, § 382 requires only that the trade or business of the loss corporation continue to operate.[28] Continuity refers to the acquired corporation's trade or business. Hence, the inquiry focuses on what, if anything, is being continued, not who continues it.[29]

Here, TFDC's mass merchandising business continued to be carried on substantially the same as before acquisition, thus fulfilling the requirements of § 382.[30] The Court determined that there was continuity of the same business enterprise when it considered whether there was continuity of the following factors: employees, plant, equipment, product, location, and customers. *See supra* at V, A; 26 C.F.R. § 1.382(a)–1(h)(5). Thus, the bankruptcy court did not err in holding that substantially the same mass merchandising business was carried on.

### C.

The government cited *Euclid* to support its argument that TFDC and Federated should be treated as separate entities, and that there was no continuity of business. However, the government's interpretation of *Euclid* is flawed.[31]

According to the government, the Court in *Euclid* prohibited the carryover because before acquisition the taxpayer operated a brewery and after acquisition the taxpayer only leased its real estate. The government

---

**27.** In other words, TFDC must conduct the day-to-day operations of the mass merchandising stores.

**28.** Section 382 further requires relatedness between the losses generated and the gains generated.

**29.** In *Frederick Steel,* the Sixth Circuit stated that "whether or not the carry-over is allowed should be based on economic realities rather than upon such artificialities as the legal form of reorganization." 375 F.2d at 352–53 (citations and quotations omitted).

**30.** Even if the Court concluded that Federated operated the mass merchandising stores, a delegation of the day-to-day operations in this case is

not a substantive change compelling the conclusion that substantially the same mass merchandising business was not carried on.

**31.** In *Euclid,* a brewery business sold all of its equipment but continued its corporate life for the purpose of liquidating its real estate. A machinery business bought the corporate shares of the brewery. The former brewery then operated as a heavy machinery business.

The tax court held that § 382(a)(1) prohibited the carryover of losses sustained in the brewing business to offset profits later made in the machinery business. *Id.* at 992. The Sixth Circuit affirmed the tax court's decision.

argues that, similarly, the Court should prohibit the carryover because before acquisition TFDC operated a mass merchandising business and after acquisition TFDC only rented out its stores.

The Court disagrees with the government's interpretation of *Euclid* because, in *Euclid*, the court stated that the former brewer "attempted to carry over the losses suffered in the brewery business and deduct them from the substantial profits of the *machinery business.*" *Id.* at 993 (emphasis added). Thus, the Sixth Circuit found that the post-acquisition heavy machinery business was unrelated or not substantially similar to the brewery business. *See also Coast Quality,* 463 F.2d at 511 n. 7.

*Euclid* may be further distinguished because, in *Euclid,* the brewery became dormant before acquisition and, even after acquisition, never resumed operations. In the instant case, in contrast, the mass merchandising stores never became dormant, and, after acquisition, they continued to operate.

Moreover, in *Euclid,* a dormant brewery business was acquired. It then became a completely different business—a heavy machinery business. In the instant case, TFDC, an active mass merchandising business, was acquired. The mass merchandising business then continued to operate. The mass merchandising stores operated before acquisition and after acquisition without interruption. Because the mass merchandising stores continued to operate, and operated in much the same manner as they had before acquisition, this factor supports the conclusion that there was business continuity.

## VI.

■ The government next argues that even if the Gold Circle division's activities are attributed to TFDC, the bankruptcy court erred in finding that Federated did not discontinue more than a minor portion of TFDC's trade or business. (Doc. 5 at 29). The government contends that a corporation does not continue to carry on substantially the same trade or business if it discontinues more than a minor portion of its operations. (Doc. 5 at 30).

The Treasury Regulations state:

A corporation has not continued to carry on a trade or business substantially the same as that conducted before an increase in the ownership of its stock if the corporation discontinues more than a minor portion of its business carried on before such increase.

26 C.F.R. § 1.382(a)–1(h)(7).

According to the government, Federated discontinued more than a minor portion of the business carried on before the change in ownership because Federated operated stores at only seven of the thirty-one former Twin Fair locations and discontinued the supermarket operations which represented approximately 40% of each store's sales.[32]

The sale of the Ohio stores and the discontinuance of the supermarket operations took place before acquisition. However, the Treasury Regulations state:

A change in the trade or business of a corporation made in contemplation of a change of stock ownership will be treated as if such change occurred after such change in stock ownership. For example, if a loss corporation changes its business as part of a plan initiated by, or on behalf of, prospective buyers of the loss corporation's stock who wish to avoid the provisions of section 382(a), a subsequent sale of stock to such buyers will cause the change in business to be treated as if it had occurred after the sale.

26 C.F.R. § 1.382(a)–1(h)(3).

The government and Federated disagree as to whether the sale of the Ohio stores and

---

**32.** Previously, TFDC operated sixteen stores in the Ohio division and fifteen stores in the New York division.

Most of the stores in the New York division had supermarket operations in addition to mass merchandising operations.

According to the government, there was a discontinuance of more than 70 percent of the New York operations. The government also maintains that TFDC's books reflect that TFDC's Ohio division generated at least $10 million of the NOLs at issue, and therefore, approximately $16 million of the NOLs were generated by the New York division.

the discontinuance of the supermarket operations were made "in contemplation of" the acquisition.

The Court, however, declines to reach this issue, however, because the ultimate issue, whether a reduction in the original size of a trade or business amounts to a discontinuance of more than a minor portion of that trade or business, is dispositive. The Court will separately treat the issue whether the discontinuance of the supermarket operations constitutes a discontinuance of more than a minor portion of the business.

### A.

The Treasury Regulations offer some insight as to what constitutes a discontinuance of more than a minor portion of a business. They state:

> In determining whether the discontinued activities are more than "minor" for purposes of the preceding sentence, consideration shall be given to whether the discontinuance of the activities has the effect of utilizing loss carryovers to offset gains of a business *unrelated* to that which produced the losses.

26 C.F.R. § 1.382(a)–1(h)(7) (emphasis added).

The government argues that the income sought to be offset does not relate to the pre-acquisition losses and credits, or even the operations of the seven former Twin Fair stores. Except for the first year, Federated never generated any income from these stores.

Federated contends, however, that § 1.382(a)–1(h)(7) was intended to apply when a corporation purchases a loss corporation involved in a number of unrelated businesses and then disposes of the business that generated the operating losses.[33] According to Federated, it is the use of the losses generated by the business that was disposed of against the income of the unrelated businesses that is improper. Since the pre-acquisition mass merchandising business is related to or substantially similar to the post-acquisition mass merchandising business, Federated argues that § 382 does not apply.

▬ Because the Treasury Regulations set forth the consideration that the gains of the post-acquisition business be related to the losses of the pre-acquisition business, the Court considers the language "more than a minor portion" as qualitative rather than quantitative. Accordingly, a reduction in the size of a corporation does not necessarily amount to a discontinuance of more than a minor portion of the total business activity carried on before the acquisition.

The statute itself supports a qualitative rather than quantitative interpretation. 26 U.S.C. § 382(a)(1)(C). The language "continue to carry on a trade or business substantially the same" connotes that the substance of the trade or business continues to be carried on, not the size of the business.[34]

**33.** 26 C.F.R. § 1.382(a)–1(h)(7) provides two examples to illustrate what constitutes a discontinuance of more than a minor portion of business.

**Example (1).** X Corporation, a calendar year taxpayer, is engaged in three separate businesses, A, B, and C. Approximately one half of X Corporation's total business activities (measured in terms of capital invested, gross income, size of payroll, and similar factors) relates to business A, 30 percent to business B, and the remaining 20 percent to business C. On December 1957, X Corporation has substantial net operating loss carryovers all of which are attributable to the operation of business C. On June 1, 1958, Y corporation purchases at least 50 percent in value of X Corporation's outstanding stock and during 1959 X Corporation discontinues business C. As of December 31, 1959, X Corporation has not continued to carry on substantially the same trade or business as that conducted prior to the increase in ownership.

**Example (2).** Assume the same facts as in example (1), except that all of X Corporation's net operating loss carryovers are attributable to business A and that the capital released by the discontinuance of business C is used to revitalize business A. Since the discontinuance of business C does not result in the utilization of net operating losses attributable to one business to offset gains of a business unrelated to that which produced the losses, the discontinuance of such business does not of itself constitute the failure to carry on substantially the same trade or business as that conducted prior to the increase in ownership.

**34.** Depending on the nature of the trade or business, it is possible that a change in the size of the corporation may result in a change so significant that it alters the substance of the corporation so that it is no longer substantially the same trade or business. In this case, however, a reduction in size does not alter the substance of the mass

The key consideration is not what portion of the total business activities the discontinued business represents, but whether the business that generated the NOLs continues to be carried on and whether the losses that it generated are *related* to the post-acquisition business that generated the income. *See* 26 C.F.R. § 1.382(a)–1(h)(5).

In enacting § 382(a), Congress wanted to prevent corporations from making a business out of acquiring loss corporations for no other purpose than to deduct their NOLs. *Six Seam Co., Inc. v. United States*, 524 F.2d 347, 352 (6th Cir.1975). Congress could have eliminated NOL trafficking by flatly prohibiting the carryover of NOLs after a change in ownership.[35] However, Congress included the language "continued to carry on a trade or business substantially the same." 26 U.S.C. § 382(a)(1)(C). The Court interprets this language to mean that if there is a valid purpose behind acquiring a loss corporation, namely, to continue the business (or a business substantially similar to the business) operated by the loss corporation previously, then the loss corporation's NOLs may be carried over. The language of the statute demonstrates that Congress intended to eliminate the practice of acquiring a loss corporation without carrying on the loss corporation's business. Congress wanted to ensure that the original trade or business survives and is carried on.[36]

Although TFDC's mass merchandising business was reduced to seven stores, the mass merchandising business survived the acquisition and was carried on. The mass merchandising business merely changed in size, but was not discontinued. The reduction in size did not change the substance of the business. Because a business substantially the same was carried on, the NOLs generated pre-acquisition were related to the post-acquisition gains.[37]

To determine whether the loss carryovers were related to the business which produced the losses, the Fifth Circuit, in *Coast Quality*, 463 F.2d at 511–12, asked whether the business that generated the gain was the "same economic endeavor" as the business that generated the loss. The court emphasized that at all times, before and after acquisition, the taxpayer carried on the residential real estate development business. *Id.* Because the taxpayer was involved in the same economic endeavor, the court concluded that the taxpayer continued to carry on a trade or business substantially the same as before. *Id.*

In *Coast Quality*, the government alleged that the disposal of a division constituting 44 percent of the taxpayer's assets amounted to the discontinuance of more than a minor portion of its business. The court stated:

> We are thus asked to hold that losses follow an asset and may not be carried over in an economic endeavor that has not altered materially and in which that type asset is an integral part. We are unpersuaded that under the circumstances found here either a literal reading of § 382(a) or the motivating rationale that we discern from the scanty legislative history requires our acceptance of the loss-follows-asset theory.

*Id.* at 512.[38]

Significantly, as in *Coast Quality*, Federated carried on the same economic endeavor—

merchandising retail business which continues to be carried on.

**35.** This, in effect would chill the acquisition of loss corporations.

**36.** Moreover, by requiring "relatedness" Congress limits the use of NOLs to acquisitions that presumably have a legitimate business purpose beyond the use of the NOLs.

The "relatedness" requirement is used to explain the general objective of § 382(a), *see* 26 C.F.R. § 1.382(a)–1(h)(5), and to determine whether the discontinued activities are more than "minor," *see* 26 C.F.R. § 1.382(a)–1(h)(7).

**37.** The Court again notes that the language "substantially the same" allows some flexibility. *Goodwyn Crockery*, 315 F.2d at 113; *Coast Quality*, 463 F.2d at 510 ("The statute clearly contemplates ... a permissible range of contraction of business activities without the loss of the deduction.").

**38.** The taxpayer in *Coast Quality* had accrued NOL carryovers totaling $288,178, and $258,876 of that was attributable to the division that was discontinued. Nevertheless, the court allowed the taxpayer to carryover the NOLs.

the mass merchandising business. Moreover, this Court does not accept a loss-follows-assets theory. Federated is not prohibited from carrying over the NOLs generated by the stores simply because some of the stores that generated NOLs are no longer part of the post-acquisition business. This is because the business that generated the losses is related to and is the same economic endeavor as the business that seeks to deduct them.[39] Although some of the NOLs were generated by mass merchandising stores that no longer operate, the same overall business which generated the losses—the mass merchandising business—continues to be carried on.

### B.

■■■ The government also argues that the discontinuance of the supermarket operations, representing 40 percent of the revenue-producing operations in each of the New York stores, constituted a discontinuance of more than a minor portion of TFDC's operations. According to the government, the discontinuance of the supermarket operations cannot be dismissed as a mere change in a brand or product line because changes in products must be considered under the continuity of business test. See 26 C.F.R. § 1.382(a)–1(h)(5).

In response, Federated contends that the supermarket operations were only a minor portion of TFDC's profitable business and that the basic character of the business was not altered. Federated argues that the discontinuance of the supermarket operations amounted to the elimination of a product or line, and did not constitute a substantial change since the overall character of the business remained constant.

The bankruptcy court referred to the supermarket operations as a product line and held that the "elimination of the perishable grocery section in the Buffalo stores ... did not alter the basic character of TFDC's busi-

ness, which was mass merchandise retailing." Federated, 135 B.R. at 973.

Example (1) of the Treasury Regulations, 26 C.F.R. § 1.382(a)–1(h)(7), refers to three "separate businesses" when it interprets what constitutes a discontinuance of more than a minor portion. The supermarket operations did not constitute a separate business in the sense of a distinct economic endeavor identifiable by objective characteristics like employees, location, customers, and product. See 26 C.F.R. § 1.382(a)–1(h)(5).[40] The supermarket operations were instead a product line or a separate department within the mass merchandising stores. See Glen Raven Mills, Inc. v. Comm'r, 59 T.C. 1, 12–13, 1972 WL 2518 (1972).

This Court concludes that the supermarket operations were not a "separate business" that TFDC operated and then discontinued. Instead, by discontinuing the supermarket operations TFDC merely stopped selling a line of products once sold by the mass merchandising retailer. As a product line or department, the supermarket operations were part of the same economic endeavor that was carried on post-acquisition—the mass merchandising business. The discontinuance of the supermarket operations did not constitute more than a minor portion of the business carried on before acquisition.

For the above reasons, the bankruptcy court did not err in finding that Federated did not discontinue more than a minor portion of TFDC's trade or business.

### VII.

■■■ The Court will next address the issue whether the principal purpose behind the acquisition is the evasion or avoidance of federal income tax. 26 U.S.C. § 269 provides for the disallowance of deductions and other tax benefits when the principal purpose behind the acquisition of control of a corporation is evasion or avoidance of federal income

---

**39.** If Federated did not continue the business that generated the NOLs—the mass merchandising business—then Federated could not carry over the NOLs. .See 26 C.F.R. § 1.382(a)-a(h)(7) Ex. (1).

**40.** The discontinuance of the supermarket operations are better considered as an elimination of a product which is but one of the factors in the objective test set forth in 26 C.F.R. § 1.382(a)–1(h)(5). In applying the objective test, supra at V, A, the Court concluded that a business substantially the same was carried on.

tax.[41] This section is "operative only if the evasion or avoidance purpose outranks, or exceeds in importance, any other one purpose." S.Rep. No. 627, 78th Cong., 1st Sess. 59 (1943); 26 C.F.R. 1.269–3(a); *U.S. Shelter Corp. v. United States,* 13 Cl.Ct. 606, 620, 87–2 U.S. Tax Cas. (CCH) P 9588 (1987) (for evasion or avoidance of federal income taxes to be the principal purpose of acquiring control of a corporation it must exceed all other purposes in importance). The determination of the purpose of the acquisition presents a question of fact which must be resolved by considering all the facts and circumstances surrounding the transaction. 26 C.F.R. 1.269–3(c); *D'Arcy–MacManus & Masius, Inc. v. Comm'r,* 63 T.C. 440, 449, 1975 WL 3195 (1975). Upon review, the bankruptcy court's findings of fact shall not be set aside unless clearly erroneous. Bankr.R. 8013.

The bankruptcy court found that Federated's Gold Circle division wanted to acquire TFDC because it was an excellent opportunity to establish a Gold Circle business presence in the Buffalo area, and that the TFDC acquisition complied with the expansion objectives embodied in the Gold Circle Long Range Plan. Thus, the bankruptcy court held that the principal purpose of the transaction was business expansion and not the avoidance of federal income tax. 135 B.R. at 972.

### A.

The government alleges that Federated acquired TFDC for the principal purpose of obtaining tax benefits. According to the government, to determine the principal purpose behind the transaction the Court must ask why it was structured as a stock purchase. The government maintains that while Federated may have had valid business reasons for

wanting to enter the Buffalo market, the principal purpose for acquiring *stock* rather than acquiring *TFDC's leases* was tax avoidance. The government contends that if nontax business goals could have been satisfied by another form of transaction and there is evidence of substantial consideration of the tax benefits, the deduction should be disallowed.[42]

■ Federated acquired TFDC for both business-motivated and tax-motivated purposes.[43] The question before the Court however is not why the transaction was structured as a stock purchase. Rather, the question is did Federated's tax-motivated purpose behind acquiring TFDC exceed in importance its business-motivated purpose. *See* 26 U.S.C. § 269; 26 C.F.R. 1.269–3(a). In other words, was Federated's tax-motivated purpose the principal purpose behind acquiring TFDC. The method of acquisition is but one factor to consider in determining the principal purpose of the acquisition, but it is not the threshold inquiry. *Arwood Corp. v. Comm'r,* 30 T.C.M. (CCH) 6, 23, 1971 WL 2427 (1971).

In *Arwood Corp. v. Comm'r,* 30 T.C.M. (CCH) 6, the government similarly argued that because the method chosen to accomplish the merger was one which permitted a carryover of the operating losses, the taxpayer's primary motivation for the merger was the reduction of its taxes. The court rejected this argument, stating:

> We do not believe that, whenever the method chosen in a given case to effect an acquisition is one which assures favorable tax results, we must necessarily conclude that the principal purpose of the transaction is tax avoidance.... We think that

---

**41.** Section 269(a) provides that if

any person or persons acquire ... directly or indirectly, control of a corporation ... and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such corporation would not otherwise enjoy, then the Secretary or his delegate may disallow such deduction, credit, or other allowance.

All section references refer to the Internal Revenue Code of 1954 unless otherwise specified.

**42.** Federated never directly addresses the government's argument that the Court must inquire why the transaction was structured as a stock purchase. Instead, Federated argues that the principal purpose behind the acquisition was business-related.

**43.** The Court concludes that because Federated was aware of TFDC's existing NOLs before acquisition and considered the value of the NOLs in setting the amounts of the promissory notes, Federated had a tax-motivated purpose behind the acquisition.

arranging the merger in a manner that produces the most favorable tax results is simply intelligent business planning.... [S]ection 269 addresses itself to a situation where the principal purpose of the acquisition is tax avoidance; in the present case only the method selected for effecting the acquisition was motivated to some extent by tax considerations.

*Arwood*, 30 T.C.M. at 22–23; *Shelter*, 13 Cl.Ct. at 625; *D'Arcy*, 63 T.C. at 451–52.

Similarly, in *Glen Raven*, 59 T.C. 1, the government argued that the taxpayer could have accomplished its business purposes without purchasing stock, and that the stock purchase reveals a tax-motivated purpose.[44] The court determined, however, that the taxpayer needed a new source of fabric for its operations and that the acquisition was in response to that need. The court stated that although the taxpayer "knew before the purchase of the possible tax benefits flowing from [the acquired corporation's] prior period operating losses, ... business necessity rather than tax avoidance was the principal purpose for its purchase...." *Id.* at 15.[45]

Two cases, *Canaveral Internat'l Corp. v. Comm'r*, 61 T.C. 520, 1974 WL 2718 (1974), and *VGS Corp. v. Comm'r*, 68 T.C. 563, 1977 WL 3758 (1977), arguably support the government's assertion that § 269 requires a showing that the chosen method of acquisition was principally motivated by business reasons.

In *Canaveral*, the taxpayer desired to acquire a yacht, a certain corporation's principal tangible asset, but after discovering the potential tax benefits involved, the taxpayer acquired the stock of the corporation instead. The court in *D'Arcy*, 63 T.C. at 452–53, distinguishes *Canaveral* from a situation similar

to the instant case. In *D'Arcy*, the court stated:

> While there is a great deal of difference between acquiring one asset, the yacht in *Canaveral* ..., and acquiring a corporation, we do not see so great a difference between acquiring a corporation's entire operation (i.e. acquisition of assets) as here, and acquiring the corporation itself [ (i.e. acquisition of stock) ]. We do not think a change in form of acquisition from the acquisition of a corporation to the acquisition of a corporation's entire operation is so drastic to warrant a mandatory denial of the carryover of tax attributes.

*Id.* at 452–53. Similarly, this Court does not believe that the difference between acquiring the assets of TFDC and acquiring the stock of TFDC is drastic enough to warrant mandatory denial of the carryover of NOLs. So long as the principal purpose behind acquiring TFDC was for business reasons, the NOL carryover should not be denied.[46]

Contrary to *Canaveral* and *VGS*, the Court concludes that the method of acquisition is but one of many factors to consider when determining the principal purpose. "[C]onsideration of the tax aspects of a transaction does not mandatorily require application of section 269 and ... such consideration is only prudent business planning." *D'Arcy*, 63 T.C. at 451. The taxpayer may consider tax attributes when structuring its transactions so long as the principal purpose behind the acquisition is business motivated. *Arwood*, 30 T.C.M. at 22–23.

## B.

The government argues that Federated could have met its stated business goal without gaining control of TFDC, and that the bankruptcy court failed to admit and consid-

---

44. In *Glen Raven*, the acquiring business manufactured yarns, hosiery, and knit products. The acquired business manufactured hosiery. After acquisition, the business that was acquired was converted for use in making flat fabric rather than hosiery.

45. The Court notes that the owner wanted to disassociate himself entirely from the acquired business by selling the stock. *Id.* at 15. Similarly, in this case Twin Fair wanted to divest TFDC in its entirety.

46. In *VGS*, the court quotes *Canaveral* for the proposition that the method of acquisition must be principally business motivated. Nevertheless, the court held that the principal purpose of the acquisition was not the avoidance or evasion of income tax. The court concluded that business reasons motivated the stock purchase—VGS needed the cash flow to finance future capital requirements.

er relevant evidence concerning alternative transactions.

The Court need not speculate as to the other ways Federated could have met its stated business goal of expanding Gold Circle's mass merchandising operations into the Buffalo area. The Court need only inquire whether Federated's principal purpose in acquiring TFDC was business motivated. The government's argument has no merit.

## C.

The Court must decide whether the bankruptcy court erred in concluding that the principal purpose behind the acquisition of TFDC was business expansion and not the evasion or avoidance of federal income tax.

Federated argues that the acquisition was driven by its interest in expanding the market of its Gold Circle division. To support its argument, Federated states that the return on investment and the cash flow return from the acquisition were above the percentages targeted, and even if the NOLs were not realized, the cash flow return was reduced by a mere one-half percent.[47]

 U.S. Shelter, 13 Cl.Ct. 606, sets out factors to consider in determining principal purpose motivation.[48] The four factors to consider in determining principal purpose motivation are:[49]

(1) Whether Federated had a policy of tax avoidance;

(2) Whether going public was a significant purpose for acquisition;

(3) Whether obtaining assets was a significant purpose for acquisition; and

(4) Whether factors exist which corroborate a business purpose.

U.S. Shelter, 13 Cl.Ct. at 623–36.

## 1.

In determining whether Federated had a policy of tax avoidance, the Court may con-

sider whether Federated was predisposed to tax avoidance practices. Regarding Federated's acquisition pattern, the bankruptcy court concluded that Federated had never been involved in a transaction with NOLs. 135 B.R. at 966. Having found no information to the contrary, this weighs against the conclusion that Federated had a policy of tax avoidance.

Moreover, "a formally documented policy of expansion or diversification through acquisition rather than through internal growth tends to establish a non-tax avoidance motive." U.S. Shelter, 13 Cl.Ct. at 624. The bankruptcy court concluded that Federated had such a policy in Gold Circle's Long Range Plan. 135 B.R. at 970. The government argues that Federated and the bankruptcy court misapplied this prong. According to the government, Federated did not have a formally documented policy of expansion through acquisition. The government refers to the bankruptcy court's finding of fact No. 15 which states that "[p]rior to [the fall of 1981], it had not been the practice of either Federated or Gold Circle to acquire the stock of a company." 135 B.R. at 966.

Even though it had not been the practice of Federated or Gold Circle to acquire the stock of a company, the Long Range Plan did provide that the acquisition of an established business would allow expansion at approximately one half the investment. This is a formally documented policy of expansion through acquisition. In any event, there is no evidence in the record that Federated had a policy of tax avoidance through the use of NOLs because it had not been involved in transactions involving NOLs.

 The Court may also consider contemporaneous statements and actions to determine whether Federated had a policy of

---

47. According to the government, this finding is errant.

48. The government argues that the bankruptcy court and Federated erroneously relied on U.S. Shelter. The government distinguishes U.S. Shelter from the instant case in that in U.S. Shelter, no value was placed on the NOLs whereas here, there is a direct link between the NOLs and the

two promissory notes. To the Court, this means that the government disagrees with the decision in U.S. Shelter but does not object to the test set forth in U.S. Shelter.

49. Both the bankruptcy court and Federated omitted two of the four factors (factors 2 and 3). This Court will consider all four factors.

**352**

tax avoidance. Statements and actions supporting a tax avoidance policy include that the NOLs were discussed during negotiations and were factored into the promissory note amounts. However, considering the tax ramifications is not fatal. *U.S. Shelter,* 13 Cl.Ct. at 624–25 (intelligent business planning).

Statements and actions negating the existence of a tax avoidance policy include the Long Range Plan, Merrill Lynch's unsolicited proposal, Twin Fair's desire for a stock sale, and that Federated remodeled the stores, invested money in them, and continued to operate them. Consideration of the contemporaneous statements and actions do not show that Federated had a tax avoidance policy. Overall, this factor supports a business purpose.

### 2.

Regarding whether going public was a significant purpose for acquisition, the government argues that in *U.S. Shelter,* the principal business purpose was going public, whereas in this case, there was no business purpose behind the stock sale.

The Court agrees that in *U.S. Shelter* the court stated that going public was a significant purpose of the transaction and far outweighed the tax considerations. 13 Cl.Ct. at 631. In the instant case, going public was not a significant purpose. This factor consequently does not support a business purpose behind the stock purchase.

### 3.

The third factor for consideration is whether obtaining assets was a significant purpose for acquisition. According to the government, in *U.S. Shelter,* the acquisition of business assets was an important element, whereas in this case, TFDC's assets were of little value to Federated because it only wanted store locations.

The government's reasoning is flawed. Store locations are business assets. Therefore, obtaining assets, i.e., the store locations, was a significant purpose behind the acquisition. Accordingly, this supports a business purpose.

### 4.

The fourth factor to consider is whether factors exist that corroborate a business purpose. The Court must first consider whether, upon acquisition, Federated acquired a going corporation rather than a shell corporation. The Court concludes that, upon acquisition, TFDC was more than a mere shell. TFDC operated fifteen mass merchandising stores, and TFDC continued to operate the remaining stores during the renovations. This sub-factor supports a business purpose.

The second consideration is whether the acquired business continued to operate. This Court determined that the mass merchandising business operated by TFDC pre-acquisition continued to operate post-acquisition. *See supra* at V. The Buffalo stores continued to operate for more than two years after acquisition. This sub-factor supports a business purpose.

Third, the Court must consider whether there were any efforts to make TFDC profitable. Federated spent approximately $1 million per store to renovate the seven stores. Also, Federated budgeted $250,000 per store for pre-opening expenses. This sub-factor supports a business purpose.

Finally, the Court must compare the value of the acquired corporation to the magnitude of NOLs. Because this sub-factor calls for an evaluation of the magnitude of NOLs, the Court will now consider the government's argument regarding economic benefits. The government argues that the bankruptcy court failed to consider the economic benefits obtained by Federated. According to the government, the court erroneously believed that the benefits provided by the NOLs were of no value to Federated because all of that value would be transferred to Twin Fair under the promissory notes. The government contends that Federated obtained significant value from the NOLs because of the actual tax savings and the time value of money. Moreover, the government argues that the court failed to consider other tax benefits, such as the fixtures write-off and an imputed interest deduction.[50]

---

**50.** With respect to fixtures, the bankruptcy court concluded that this part of the case amounted to

The bankruptcy court addressed this sub-factor in light of § 269(c). The bankruptcy court stated that

> [u]nder § 269(c), even if the magnitude of NOLs are large as compared to book value, it remains only one of many factors and is not, by itself, dispositive.... There is even some authority for the proposition that the comparison of these values is only marginally related to the consideration of valid business purpose.

135 B.R. at 971 (cites omitted).[51]

Even if the bankruptcy court determined that Federated would obtain a tax savings of $13.5 million from the NOLs, $3.2 million from the fixtures write-off, and $3 million from the imputed interest deduction, it can still be concluded that the acquisition was principally business motivated. This is again but one factor to consider when determining the principal purpose.

That the tax benefits were of potential economic value supports a tax motivated purpose. Nevertheless, the Court is not persuaded that the ratio of tax benefits to the value of TFDC calls for a finding that tax avoidance was the principal purpose. When this factor is considered together with the previously discussed factors, it must be concluded that the principal purpose motivating the acquisition was business related.

These four sub-factors, taken together, corroborate a business purpose.

### 5.

Federated presents another factor, beyond the four set forth in *U.S. Shelter*, for the Court's consideration—the seller's insistence on a stock purchase. Federated contends that Twin Fair's demand for stock is further evidence of a legitimate business purpose. *Princeton Aviation Corp. v. Comm'r*, 47

T.C.M. (CCH) 575, 585 n. 28, 1983 WL 14724 (1983) (a seller's insistence to purchase the stock as a prerequisite to a deal constitutes sufficient business purpose to render § 269 inapplicable); *Superior Garment Co. v. Comm'r*, 24 T.C.M. (CCH) 1571, 1577, 1965 WL 1053 (1965); *Baton Rouge Supply Co. v. Comm'r*, 36 T.C. 1, 1961 WL 1103 (1961). According to Federated, Twin Fair was not willing to sell its assets and desired to divest TFDC in its entirety.

 The government responds that the bankruptcy court misread *Baton Rouge* and *Princeton Aviation* to mean that any time the seller insists that the transaction be structured as a sale of control, even if the insistence is to assure that top dollar is received for the sale of the tax benefits, § 269 is automatically inapplicable. According to the government, the bankruptcy court's holding sanctions trafficking so long as it is the seller's idea. The government submits that Twin Fair's insistence on a stock acquisition for the purpose of getting value for TFDC's tax losses and other tax attributes is *prima facie* evidence that the principal purpose of the transaction was to avoid taxes.

The Court agrees that a seller's insistence on a stock sale does not automatically exempt the buyer from § 269. Whether the seller insisted on a stock sale is but one factor to consider when determining the primary purpose behind acquisition. This factor—that Twin Fair insisted on a stock sale—shows that Federated did not initiate the stock sale. Therefore, this factor does not support a tax-motivated purpose.

 An additional factor to consider, however, is the underlying reason behind structuring it as a stock sale. *See supra* at VII, A.[52] According to the government, Twin Fair insisted on a stock purchase to get

---

an insubstantial digression from the main issues in the case because much of the informal arrangements over unwanted fixtures was dependent on the speculative liquidation value of those fixtures. 135 B.R. at 973.

**51.** The government notes that § 269(c) was repealed in 1976 and has no application whatsoever to the Federated acquisition of control. Federated recognizes this and states that the bankruptcy court did not rely upon the value-to-losses

ratio or § 269(c) in its analysis. (Doc. 11 at 39 n. 16).

In any event, the Court is not applying § 269(c). Instead, the Court is considering the effect of tax benefits on the principal purpose analysis.

**52.** This inquiry focuses on the motivation behind the *method* of acquisition. Contrary to the government's assertion, this is not the threshold inquiry.

354

value for the NOLs it could no longer use. According to Federated and the bankruptcy court, Twin Fair insisted on a stock sale to divest TFDC in its entirety. These motivations are both tax and business related. Nevertheless, these are the seller's motivations rather than the buyer's. In order to determine the principal purpose behind the acquisition in this case the Court should principally focus on the buyer's motivations. *See Glen Raven,* 59 T.C. at 14 (Section 269(a) requires the fact finder to make a subjective evaluation of the taxpayer's motives).

The Court concludes that this factor is negligible and supports neither purpose.

### 6.

█ The government raises an evidentiary issue on appeal that has some bearing on the issue of determining Federated's purpose. The government argues that the bankruptcy court's evidentiary ruling disabled it from proving that the principal purpose was tax motivated.

During the trial between the government and Federated, the bankruptcy court sustained several objections by Federated on the basis of attorney-client privilege. The principal objection sustained was in response to a question posed to Boris Auerbach, an attorney and Federated's secretary and vice-president. The government asked Auerbach if Paul Thiemann, an attorney and the head of Federated's tax department, recommended going ahead with the acquisition on the basis of the favorable NOLs. Later in the trial, the government again tried to adduce this information by asking Thiemann about the tax department's recommendation regarding the transaction. The government argues that the bankruptcy court's ruling sustaining Federated's objections based on the attorney-client privilege was erroneous and requires reversal.

Rule 103(a) of the Federal Rules of Evidence provides that evidentiary errors at trial are not grounds for setting aside the verdict or reversing the judgment on appeal "unless a substantial right of the party is affected." Fed.R.Evid. 103(a).

█ "[C]onfidential communications between an attorney and his client, made because of the professional relationship and concerning the subject matter of the attorney's employment, are privileged from disclosure, even for the purposes of the administration of justice." *United States v. Goldfarb,* 328 F.2d 280, 281 (6th Cir.), *cert. denied,* 377 U.S. 976, 84 S.Ct. 1883, 12 L.Ed.2d 746 (1964). The basic components of the attorney-client privilege are as follows:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

*Id.* (quoting 8 Wigmore, Evidence § 2292, at 554 (McNaughton rev. 1961)).

The government argues that Thiemann was rendering business advice to Auerbach and therefore not acting in the capacity of lawyer. The government contends that the bankruptcy court should therefore not have disallowed the government's questions on attorney-client privilege grounds.

█ Communications between an attorney and a client which relate to business, rather than legal matters, do not fall within the protection of the attorney-client privilege. *Coleman v. American Broadcasting Co., Inc.,* 106 F.R.D. 201, 205 (D.D.C.1985). The attorney providing privileged communication must be acting as an attorney and not as a business adviser. *Atlantis Group, Inc. v. Rospatch Corp.,* No. 1:90–CV–805, 1991 WL 574963 at *8 (W.D.Mich. March 14, 1991).

█ However, the mere fact that business considerations are weighed in the rendering of legal advice does not vitiate the attorney-client privilege. *Coleman,* 106 F.R.D. at 206. The following test helps distinguish legal from nonlegal advice: "[A] matter committed to a professional legal adviser *is prima facie so committed for the sake of the legal advice* ... and is therefore within the privilege unless it clearly appears to be lacking in aspects requiring legal advice." *Diversified Indus., Inc. v. Meredith,* 572 F.2d 596, 610 (8th Cir.1977) (en banc) (quoting 8 Wigmore, Evidence § 2296

(McNaughton rev. 1961) (emphasis in original)).

Applying this test to the communication between Auerbach and Thiemann, the government's argument must fail. The communication between Auerbach and Thiemann regarded whether Thiemann recommended the acquisition on the basis of the potential NOLs. Thiemann was acting as a professional legal adviser for Federated and Auerbach. The communication related to his role as head legal adviser of Federated's tax department. Accordingly, this communication is entitled to the prima facie assumption that it was sought for the sake of legal advice.

 Furthermore, the government cannot show that this communication clearly appeared to be lacking in aspects requiring legal advice. Thiemann was providing Federated and Auerbach with advice regarding the tax consequences of the potential acquisition of Twin Fair. Tax planning advice rendered by an attorney is legal advice and communications relating to this advice fall within the attorney-client privilege. *In re Grand Jury Subpoena Duces Tecum,* 731 F.2d 1032, 1037–38 (2d Cir.1984); *United States v. Willis,* 565 F.Supp. 1186, 1190 (S.D.Iowa 1983); *United States v. Mobil Corp.,* 149 F.R.D. 533, 538 (N.D.Tex.1993) (letter relating to tax consequences of certain actions was protected from disclosure by attorney-client privilege).

In any event, if the bankruptcy court had erred in disallowing this evidence, such error would have been harmless because it could not have affected a substantial right of the government. Fed.R.Evid. 103(a). The government was able to adduce evidence from other decisionmakers of Federated regarding the purpose and intent behind the acquisition of TFDC. The government's case would not have turned on either Auerbach's or Thiemann's answers. Therefore, the government was not harmed as a result.

The bankruptcy court properly sustained, on the basis of attorney-client privilege, Federated's objections to the government's questions to Auerbach and Thiemann.

**D.**

After consideration of the foregoing factors, the Court concludes that the factors supporting a business purpose outweigh the factors supporting a tax purpose, and that the principal purpose behind the acquisition was business expansion. Even though tax ramifications were considered when choosing the method of acquisition, the bankruptcy court did not err in concluding that the evasion or avoidance of income tax was not the principal purpose behind the acquisition.

**VIII.**

For the foregoing reasons, the Court **AFFIRMS** the bankruptcy court's decision.

**IT IS SO ORDERED.**